[Civ. No. 4544. Third Appellate District.—March 19, 1932.]

THOMAS PAGE et al., Appellants, v. JAMES T. BROWN et al., Respondents.

Leland J. Allen for Appellants.

Ben F. Gray for Respondents.

PLUMMER, J.—The plaintiffs began this action to secure the rescission of a certain agreement made and entered into with the defendants Brown on or about the eleventh day of April, 1929, whereby the respective parties just mentioned agreed to exchange certain real property. To this complaint

the defendants Brown, in addition to their answer, filed a cross-complaint praying for specific performance and for a decree of the court directing and requiring the plaintiffs to fully execute their part of the agreement. The defendants Brown had judgment upon their cross-complaint for specific performance. Rescission as prayed for by the plaintiffs was denied. From this judgment the plaintiffs appeal.

The record shows that some time prior to the fifth day of April, 1929, the defendants Brown, desiring to exchange a ranch belonging to them, situate in the county of Calaveras, for property in the county of Los Angeles, engaged the services of a real estate dealer by the name of C. P. Blakemore, and left him a description of their property, as follows:

"Improved ranch, Calaveras county, California.

"Acreage: 1900 acres, more or less. Location: One mile west of Angels Camp. Elevation: 1500 feet above sea level. Climate: Mild; produces nuts, figs, oranges, etc., near this ranch. There are English walnuts, figs, apples, peaches, cherries, etc., produced on this ranch. The climate is very even; the coldest is frost or perhaps thin ice a few mornings in the winter. Soil: Best soft, mountain loam. This soil is very productive, and much of it is made-soil. Water is supplied in abundance from Angels Creek, in our own ditches. Water is all free, about 200 acres irrigated. Production: This is really a cattle ranch; is equipped for hogs also, but place is now used for sheep-raising. It will run 300 head cattle or 1500 head sheep. Acorns in abundance make hog-raising profitable. Alfalfa does well on this ranch. Some of land is heavily wooded, large portion of grazing land. 300 tons hay cut annually. Angels Creek is a wide stream flowing through the ranch; excellent fishing; good hunting. Angels Camp has 1200 population; good schools; theaters, churches, etc. Is 60 miles from Stockton, 56 miles from Modesto, 140 miles from San Francisco. Improvements; 3 living houses and 4 barns. One house has 8 rooms; one has 4 or 5 rooms, modern. Entire ranch is fenced and cross-fenced, partly hog-tight fencing, part barbed-wire. The mortgage is $13500. 10 years to run at $1500 per annum, starting May, 1930. Int. 7 per cent, payable semi-annually. Taxes $581 per year."

At about the same time the plaintiffs in this action, the owners of a small tract of land situate in the county of Los Angeles, to wit: All of lot 1, block ''A'' of the Lowell tract, county of Los Angeles, state of California, as per map recorded in book 54, page 17 of miscellaneous records of said county, containing 7.93 acres, more or less, on which tract was standing and growing lemon and orange trees, being desirous of exchanging the same for a cattle ranch, came in contact with C. P. Blakemore, who exhibited to them the description of the property belonging to the Browns, as set forth herein. Thereafter, and about the 6th of April, 1929, Blakemore took the plaintiffs and their two sons from their home in Los Angeles County to the stock ranch owned by the Browns in Calaveras County, and remained there with them two days, during which time the plaintiffs inspected the Brown ranch.

We may here state that the contention of the appellants is based upon two grounds: First, misrepresentations as to the amount of hay raised upon the Brown ranch annually; and second, the inadequacy of consideration, or, rather, the alleged disparity in the value of the two places.

The record shows that Mr. Blakemore, Mr. Brown, Mr. Page and Mr. and Mrs. Page's two sons spent two days going over the Brown ranch. In going over the ranch they walked a considerable part of the distance and rode on horses a part of the way. The Pages were shown the exterior boundary lines of the ranch; they were shown the hay land, which included the irrigated land; they were also shown the pasture lands and the portion of the land which included a small mountain peak. During the stay of the Pages at the Brown ranch they were introduced to Mr. Tyron, who had managed the Brown ranch during the time that the Browns had been owners thereof. Mr. Brown informed the Pages that he himself had only spent about six months on the ranch; had been the owner of it less than a year; that Mr. Tyron was familiar with the ranch and could tell them all about it. In relation to the quantity of hay which the ranch had, or would produce, Mr. Tyron stated that it was one of the best stock ranches in that part of the country; that it would run from 200 to 300 head of cattle, if properly cared for; that the quantity of hay produced depended entirely upon the care of the ranch; that

the ranch had had no care for six or seven years, and needed reseeding; that he had seen from 300 to 400 tons of hay cut off the ranch. During the stay of the Pages in Calaveras County they spent one night at Angels Camp, a short distance from the Brown ranch. The Pages also were shown all the irrigation ditches, the fences, and were informed as to a certain mortgage thereon in the sum of $13,500. After the two days spent in examining the Brown ranch it appears that the following conversation took place between the Pages and Mr. Brown: Mr. Page said: "I have seen your ranch; I like it better today than I did yesterday. After you come down and look at my ranch I will be glad to have you look my proposition over." Mr. Brown replied: "I am very busy; I am shearing sheep; I cannot go down on uncertainties. If you like the ranch well enough to make a proposition, I will take the time to go down and look at your property." Mr. Page replied: "Well, I will make you this proposition: I will give you my ranch for yours; you throw in the Ford truck, goats, horses and cow." Mr. Brown replied: "I couldn't throw in the horses or cow, Mr. Page. I am just pasturing the horses for their use, and the cows I don't own. I do, however, own the pony. I will give you the goats, truck and pony, provided your place suits me." After some further conversation Brown agreed to throw in a certain kitchen range that was on the Brown premises. (We are quoting from the testimony of Mr. Blakemore.) A good portion of Mr. Blakemore's testimony is taken up in answering questions to the effect that he heard no such conversation between the Pages and Brown as appears in the testimony of the Pages. Mr. Blakemore stated that after Mr. Page had made his proposition to Mr. Brown, Page and Mr. Brown shook hands upon the proposition. Thereafter the Browns went to Los Angeles, examined the land owned by the plaintiffs, and after agreeing that the plaintiffs should gather the orange crop then on the premises and one picking of lemons, an agreement was entered into on the eleventh day of April, 1929, for the exchange of their properties. The Pages, for their property, were to receive in exchange the ranch belonging to the Browns, covering between 1900 and 2,000 acres, 60 head of goats, a few chickens, pony, Ford truck and kitchen range. The agreement of exchange was left with the Se-

curity Title Insurance & Guarantee Company, with directions with regard to searching the title and carrying out the escrow instructions, which are not material herein save and except as to one paragraph, which reads as follows: "If you are unable to comply with these instructions prior to the expiration of thirty days from this date, you are instructed to comply with the same within such additional time as may be required by you, unless a demand is written and delivered to you subsequent to such expiration and prior to the filing of any document required in this escrow by any party who has signed this escrow for the return of the money and documents to the parties who deposited the same with you." The Pages' property was subject to an encumbrance in the sum of $10,500.

A deed was executed and delivered by the Pages, running in favor of the Browns, for their property in Los Angeles County, and a deed was executed by the Browns in favor of the Pages for their Calaveras County ranch, both deeds being left with the Security Title Insurance & Guarantee Company. Subsequent to the delivery of these papers and searching of the title it was discovered that the property belonging to the Pages was listed under the "Torrens Act," and an additional deed from the Pages was required, which deed has not been executed by the Pages.

After the deposit of the escrow deeds and the execution of the escrow instructions, and the agreement of exchange to which we have referred, and on or about the middle of May, 1929, the Pages moved their household effects and personal belongings to the Brown ranch, and also, on their return trips, moved the household and personal belongings of the Browns from the Calaveras County ranch to the Page ranch in Los Angeles County.

At the time of the first visit of the Pages to the Brown ranch the Browns had some 500 head of sheep feeding upon the pasture land on the Brown ranch, and it appears that when the Pages returned to the Brown ranch in the middle of May they ascertained that the hay land had been browsed over by the sheep, and that there was little or no grass left which would be available for cutting for hay. Thereupon, the Pages telegraphed and also wrote to the Security Title Insurance & Guarantee Company, notifying them to return all papers which had been signed by them and theretofore

deposited under the escrow instructions. Demand was also made upon the Browns for a cancellation of the agreement of exchange and for repossession of the Los Angeles property, possession of which had been delivered to the Browns. This demand not having been complied with, this action was begun.

The record shows that there was no reservation in the agreement or escrow instructions relative to the 1929 hay crop, but it also shows that there was some conversation between the Pages and the Browns concerning the time when possession was to be delivered of the Brown ranch, and of the fact that the Browns had some 500 head of sheep running on the ranch, and that green feed was necessary to their maintenance. In this particular the testimony is in direct conflict, and therefore was a matter solely within the purview of the trial court. The judgment in this case, however, is not sought to be set aside for this reason, and therefore need not be further discussed herein.

The first attack upon the judgment is that relating to the quantity of hay produced, and the statement contained in the description of the property left by the Browns with the agent Blakemore, wherein it is recited that the ranch produced 300 tons of hay annually. As we have stated, the Pages visited the ranch in April, 1929, and were told by Tyron that the ranch had been neglected for several years and that the hay land needed reseeding. Appellant calls our attention to the testimony of one Bava, who was at work on the ranch for four or five years preceding the transfer thereof by the Browns to the Pages. His testimony was to the effect that in no year during the time he was upon the ranch did he cut over 100 tons of hay. A witness by the name of Airola testified that he had been acquainted with the ranch for over twenty years, and that during such time 300 tons of hay were never cut during any one year. On the other hand, a witness by the name of Sanders testified that he bought the ranch in 1917; lived there until some time during 1922 or 1923, and that the least quantity of hay he ever cut off the ranch was 300 tons; the largest quantity was 600 tons; that in 1917, when he bought the ranch, he cut 150 tons; in 1920, between 350 and 400 tons; in 1921, about 300 tons; and about the same amount in 1922.

There is testimony in the record also to the effect that during the time that Bava was in charge of the place it was not properly irrigated, and that Bava cut the hay only once, whereas other witnesses stated that they cut the hay several times, four cuttings in some places.

A witness by the name of McCauley testified that the place did and would produce between 275 and 300 tons of hay per year, and that more could be obtained if the right care was taken thereof.

A witness by the name of Reister testified as to four cuttings annually while he was on the ranch. There is also testimony in the record that Mr. Brown stated to Mr. Page that all he knew about the ranch was what his neighbors had told him.

The record also shows that the Pages had an opportunity, when they were visiting the ranch, to make inquiries concerning the same, but according to their own testimony they did not do so.

From what we have here recited, as shown in the transcript, it is clear that we cannot disturb the finding of the trial court in holding that the Pages were not defrauded by any representations made concerning the quantity of hay which the ranch was capable of producing annually. The mere fact that anyone in charge of the ranch neglected to properly irrigate the same, or to make as many cuttings of hay as others had done, would not justify a holding that the statement given by the Browns to Blakemore contained any fraudulent representations. The Pages had an opportunity to investigate the ranch to see for themselves, and, according to the testimony of the witness Tyron, were advised of the fact that in recent years the ranch had been neglected and proper care had not been taken of the hay land.

█ It is next contended that the Pages have not received adequate consideration, and, therefore, under the provisions of subdivision 1 of section 3391 of the Civil Code, which provides that if adequate consideration for a contract has not been received, specific performance will not be enforced, the judgment should be reversed on account of lack of adequate consideration.

In *Boulenger* v. *Morison,* 88 Cal. App. 664 [264 Pac. 256, 258], it is said: "The law is well established that before a

court of equity will decree specific performance of the contract the plaintiff must allege and prove that the contract was just and reasonable and the consideration adequate.'' This statement of the law is supported by a long list of authorities found on page 669 of the volume cited.

''Adequate consideration, as used in section 3391, subdivision 1 of the Civil Code, does not necessarily mean the highest price obtainable, but a price that is fair and reasonable under all the circumstances; it is always peculiarly a question of fact for the trial court to determine in the light of all the facts and circumstances of each particular case. (*Boulenger* v. *Morison, supra; Morrill* v. *Everson,* 77 Cal. 114 [19 Pac. 190] ; *Wilson* v. *White,* 161 Cal. 464 [119 Pac. 895]; *Cummings* v. *Roeth,* 10 Cal. App. 144 [101 Pac. 434].)''

While an adequate consideration must be shown, the highest possible price need not be the consideration in order to sustain a judgment decreeing specific performance. Applying this rule to the case at bar it is not necessary that the respective parcels of land should be of an exact equal value or command an equal price in the market in order to require an affirmance of the judgment. If, under the circumstances surrounding the transaction, and in view of the fact that the parties had an equal opportunity to make investigations, it appears that the consideration was adequate, even though we might believe that one tract of land was of a greater value than the other, or would command a greater market price, it would still be our duty under the law to uphold the judgment.

As we have stated, in addition to the real estate involved, the Browns agreed to deliver, and did deliver, sixty head of goats, one pony, saddle and kitchen range. On the other hand, the Pages reserved the crop of oranges upon their Los Angeles County property and one picking of lemons. The testimony set forth in the record would indicate that the Page property in Los Angeles County would probably sell for a somewhat greater price than the Brown ranch in Calaveras County. The record, however, does not show the market value of either property in the true sense of the word. None of the witnesses were interrogated as to the market value of either property; they were simply asked what they thought the different properties were worth.

Both of the appellants' testimony was introduced, and several witnesses testified that the Page property was worth $40,000 to $45,000. On the part of the respondent testimony was introduced that the Page property was worth only about $24,000 or $25,000. An analysis of the testimony shows that the value set upon the Page property by the real estate dealers who testified concerning the same was all based upon the possibilities, and what we may properly call the future possibilities of selling a portion thereof for town lots, the testimony showing that the Page property faced upon a boulevard leading to the city of Whittier, some miles distant. Thus, when the different possibilities of the use of the property were segregated, and the respondents' witnesses were interrogated as to the possible use of the property in the manner indicated, they testified to a valuation of between $31,910 up to $34,270, but that taken as a whole the property was worth only about $25,000.

The record is absolutely silent as to the expenses that would be necessary in subdividing the property and placing it upon the market for town-lot purposes, or rather, for country homes, upon lots similar in size to those found in incorporated cities. The record is also silent as to there being any present market for residence lots on the Page property, though there is some testimony that residence lots had, at some date previously not given, been sold from a tract of land between one and two miles distant from the Page property, which one of the witnesses testified was not quite so favorably situated.

As to the value of the Calaveras land, one of appellants' witnesses testified that it was between $20,000 and $22,000. Mr. Tyron, a witness for the respondent who had lived on the land and managed the same, testified that it was worth $25,000, and one witness by the name of Ruthven, who had spent only one day upon the land, had made no inquiries concerning the value of lands in Calaveras County, and who testified that he was not familiar with the value of lands north of Fresno, was allowed to state his opinion that the Brown ranch was worth the sum of $40,000. Though admitted by the trial court, we cannot conceive that the court gave any consideration to an opinion based only upon confessed ignorance. It should have been excluded, but we nevertheless think it harmless.

In view of the fact that the witnesses testifying as to the value of the Page property, based their estimates so largely upon what clearly appears to be speculative possibilities in the use of the property for subdivision purposes, we cannot say that the court was not justified in taking the statement of witnesses who testified as to the value of the property taken as a whole, and just as it existed at the time of entering into the agreement of exchange by the respective parties to this action, especially in view of the fact, that no information was given to the trial court as to the expenses that would necessarily be incurred in subdividing the property and marketing the same, and also, as we have stated, the silence of the record as to there being any existing market for the property even though subdivided.

A setting forth of the testimony would only show what we have summarized, and disclose the wide divergence in the estimate of values concerning the Page property, that is, its value as a whole and its value for possible subdivision purposes.

Again, the court had before it the witnesses, and could determine just how much weight should be given to the testimony of the different real estate men, concerning the subdivision possibilities of the Page property, and how much was based upon fact, and how much was based upon anticipation of future demands and inflated prices that might never exist. In this particular our attention is called to that portion of the record where it is claimed that Mr. Brown was guilty of fraud by remaining silent when Mrs. Page stated to him that their property in Los Angeles County was worth $60,000, and Brown said nothing concerning the value of the Calaveras ranch. It is urged that Brown's silence amounted to a concealment of a fraud, or to a tacit statement that the Calaveras ranch was worth an equal sum. On the other hand, in the light of the circumstances, we think the trial court was justified in concluding that the statement of Mrs. Page was of such inflated ideas concerning values, as to require no answer.

While there is some disparity in the values between the two properties, the record does not show a sufficient difference in values of properties agreed to be exchanged as to justify a reversal of the judgment on the ground of inadequacy of consideration.

■ It is also urged that as the exchanges of deeds had not been entirely completed prior to the expiration of thirty days after the signing of the escrow agreements, that the telegram and letter sent to the Title Company amounted to a rescission under the paragraph set forth in the escrow instructions which we have quoted in this opinion.

The failure, if any, on the part of the Security Title Insurance & Guarantee Company was due to the fact that the appellants had not executed the second deed due to their property having been listed under the "Torrens Act". We do not very well see how the appellants can take advantage of their own neglect or failure.

The appellants strongly insist that the circumstances of this case are similar to those involved in the case of *De Garmo* v. *Petitfiles Confiserie Corp.*, 93 Cal. App. 261 [269 Pac. 692], and that the decision herein should be governed thereby. A reading of the De Garmo case shows that it is inapplicable. The De Garmo case bristled with fraudulent representations, which are absent from the record in the case which we are now considering.

The judgment is affirmed.

Thompson (R. L.), J., and Preston, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 18, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 16, 1932.