[Civ. No. 8558. Second Appellate District, Division Two.—July 14, 1933.]

LAURA BELLE DAMEREL, Appellant, v. NORTH AMERICAN BOND & MORTGAGE COMPANY (a Corporation), Respondent.

OLIVIA McCLAIN, Appellant, v. NORTH AMERICAN BOND & MORTGAGE COMPANY (a Corporation), Respondent.

LAURA BELLE DAMEREL, Appellant, v. NORTH AMERICAN BOND & MORTGAGE COMPANY (a Corporation), Respondent.

Ingle Carpenter and Harold A. Fendler for Appellants.

A. Ronald Button and Geo. T. Warren for Respondent.

PARKER, J., *pro tem.*—This appeal is taken from a single judgment entered in three consolidated actions, which judgment is against the plaintiff and in favor of defendant in each case. The plaintiff Laura Belle Damerel instituted two actions, one for money had and received and the other in claim and delivery, whereby she sought recovery of a non-negotiable note in exchange by her for capital stock of defendant corporation. The action of Olivia McClain was for money had and received.

Practically the same issues are presented in the three cases. We will take first the case of Olivia McClain. On or about July 12, 1929, Mrs. McClain purchased through one Joe Zastrow fifty shares of the preferred capital stock of North American Bond & Mortgage Company, a corporation. Throughout this opinion hereinafter the said company will be referred to as North American Company. On October 25, 1929, she purchased one hundred and seventy shares additional. In each instance she paid $100 per share and the transaction was a cash deal. It was found by the trial

court that the purchase of the stock in each instance was induced by and through the fraud and deceit of Joe Zastrow, who falsely and fraudulently represented the facts to Mrs. McClain for the purpose of inducing her to buy the stock. It is further found that Mrs. McClain believed in and relied upon these fraudulent representations and was induced thereby to make the purchase. Further, it is found that at the time Zastrow made such representations he, Zastrow, knew or had reason to believe, or should have known, that said representations were wholly false and untrue. These findings stand unattacked. We might add they are amply supported by the evidence. The respondent does not question the fact that Mrs. McClain was defrauded to her injury and loss. The claim is that Zastrow had no connection with the defendant corporation. Our first task, then, is to identify Joe Zastrow. If respondent's position is sound the case ends here. In order that the picture may be as complete as the record will permit, we may go somewhat into detail, inasmuch as our inquiry does not stop with the identification of Zastrow as an individual but is concerned more with his relationship to or with the respondent corporation.

In June, 1922, the North American Company applied to the Commissioner of Corporations for a permit to sell its preferred stock. This permit was granted. On August 31, 1929, Joe Zastrow filed with the state corporation department an application for a certificate to represent North American Company. This application may be summarized as follows: Zastrow makes application for certificate authorizing him to represent North American Bond & Mortgage Company. He supplies the routine data usual in such applications by reference to the commissioner's files. He sets forth that the terms and conditions of his employment, with particular reference to the commission he will receive, is "8%". This application is verified, and as a part thereof is the following:

"To the Commissioner of Corporations:

"North American Bond and Mortgage Company (Employer) hereby certifies that the statement made by J. Zastrow, applicant, in the foregoing application of the items

of his employment is true and correct, and requests that said application be granted.

"Dated Sept. 10, 1929.

"NORTH AMERICAN BOND & MORTGAGE CO.
_____
Employer

"Signed by      M. E. McKITTRICK

"Asst. Sec'y.
("Corporate Seal)      Title of Officer

"6331 Hollywood Boulevard—Hollywood, Cal.
_____
Address of Employer"

That portion of the application bearing the request of the North American Company was attested by and with the corporate seal. M. E. McKittrick was the assistant secretary of the corporation. Much argument is presented on the question of this instrument and its binding effect, if any, upon the North American Company. The evidence, beyond contradiction, shows that one Beesemyer was the secretary and general manager of North American. The name Beesemyer will frequently appear herein, and it may be noted that the full name is Gilbert H. Beesemyer. As general manager, Beesemyer had full charge of everything. As secretary, under the by-laws he was custodian of the corporate seal, and as manager he was to superintend and have control of the management of the affairs of the corporation subject to the direction and supervision of the directors. McKittrick, the assistant secretary, had charge of everything in North American Company, under Beesemyer. According to her testimony she signed the application of Zastrow and placed the corporate seal thereon as an incident of her usual routine. Referring to the incident she says: "It was probably brought down to me by someone, and I was asked to sign it, and as I had been signing similar papers on their request I probably did. As I remember I was told to sign it, that it was according to Mr. Beesemyer's instructions. I affixed the seal as part of the duties of secretary or assistant secretary. The seal was a part of the signature." She further testified that "where I signed for North American I thought it was all right to put the seal on, too, if it was all right to sign". This evidence, also, remains uncontradicted. It leaves no question but that the signing of the Zastrow application was authen-

tic and genuine, so far at least as the corporation commissioner was concerned.

On September 20, 1929, a certificate of authority was issued to J. Zastrow to act as agent of North American Bond & Mortgage Company "in the sale of its securities within the State of California in accordance with the permit issued to it on the twelfth day of June, 1922, and any amendment thereof or supplement thereto hereafter made". It will be observed that the application and the permit tie in with the securities of North American Company, inasmuch as the permit specifically limits the agency to the securities theretofore by the corporation commissioner permitted sale. There is in the entire record not a single word of explanation on the connection of North American with the designation of Zastrow as agent. It is not denied that North American presented the application for his appointment, nor is it denied that the act of the assistant secretary, authenticated with the seal of the corporation, was an authorized act within the scope of her duties under the direction of the general manager.

The Corporate Securities Act makes a clear distinction between agents and brokers. An agent, under the act, is one employed or appointed by a company or broker to sell securities, while a broker is one engaged in the general business of buying and selling securities. The agent must have a principal, and the very nature of his calling is one of employment. When a corporation employing an agent certifies the fact of such employment to the corporation commissioner, requesting a permit for the agent to act for the corporation in the sale of its securities, it is certainly some evidence of agency. The entire scheme of the Corporate Securities Act would be thwarted and rendered ineffective if this were not the case. Being of public record, the proceedings give notice of the agency to the world at large and estop the corporation from denying the agency thus created. However, we agree with respondent's contention that the designation of an agent under the Corporate Securities Act does not automatically install the agent as the representative of the corporation for all purposes, or even for the sale of securities, until some further steps are taken. In other words, the corporation may designate one as agent and not give him any securities to sell. By the mere designation he

would have no power to go out and contract for the sale of the corporation's securities. There must be some authorization and contract of employment. But with the designation of agency the assent of the corporation to a sale of its securities by the agent will be presumed where it is shown the sale was with the knowledge of the corporation or under conditions which imply such knowledge.

So much, then, for Zastrow. Let us now consider his conduct in connection with the sale to Mrs. McClain. Zastrow, through the found fraud and misrepresentations, induced Mrs. McClain to purchase on the first occasion 50 shares of first preferred stock of North American at the price of $100 per share. He had with him at the time a "buy" order blank on which was printed the name of the corporation, and did represent to Mrs. McClain that she was dealing direct with the corporation. Accordingly the check for $5,000 was made payable directly to North American Bond & Mortgage Company. Within a few days the stock certificate showing ownership of 50 shares in Mrs. McClain was delivered to her. The check payable to the corporation was entered upon the books of the company and was by it indorsed and cleared, and the canceled check returned to Mrs. McClain showed the indorsement and payment. On the second occasion of purchase by Mrs. McClain she secured 170 shares of first preferred stock of North American at the price of $100 per share. This transaction was somewhat involved, inasmuch as it was necessary for her to dispose of other securities in order to obtain the cash with which to procure more North American stock. She had $16,900 tied up in an investment handled through a building and loan association. At Zastrow's persuasion she made out an order on such association to pay to North American Company the sum of $16,900. Pursuant to the order the building and loan company executed and delivered to Zastrow its check for $16,900, payable to North American Bond & Mortgage Company. This check was received by the North American Company, indorsed and paid, and the amount deposited to the credit of that concern. In addition, Mrs. McClain paid $100 cash, making the total $17,000. This is the story of how Olivia McClain got her stock. The mere narrative convinces us that the stock was sold to her by North American Company and that the company not only authorized Zastrow

to act as its agent in the sale thereof but actually participated therein and received the proceeds thereof. Digressing for the moment on the question of the fraud, we may note that there is no controversy on the issue, but to bring the fraud home to North American Company, without the aid of implication, the undisputed fact is that that company, through the medium of the press and by means of paid advertisements, broadcast the same representations found to be false and at the same time Zastrow was procuring purchasers. The foregoing sufficiently disposes of this branch of the McClain case, leaving for further discussion hereinafter other phases of the appeal equally important to her cause of action.

We may pass then to the Damerel actions. Mrs. Damerel purchased through Zastrow 30 shares of stock in North American Company, giving to Zastrow her check for $3,000 payable to North American. This check was indorsed, cashed and deposited to the credit of the company. This transaction took place on April 24, 1930. Here we may note again the status of Zastrow with relation to North American Company. As we have already noted, Zastrow had secured the authorization as agent for North American in 1929. This expired December 31, 1929. On January 13, 1930, a renewal application was filed by Zastrow with the corporation commissioner. The former application was by reference expressly made a part of the renewal application. Zastrow again applied for authorization to act as agent for North American Bond & Mortgage Company. As a part of the application was the following:

"J. M. Friedlander—Commissioner of Corporations

"J. Zastrow hereby requests that the foregoing application be granted.

"Dated January 13, 1930.

"NORTH AMERICAN BOND & MORTGAGE CO.
_(Name of Company)_

"By GILBERT H. BEESEMYER (Signed)
"Secy-Manager

"6331 Hollywood Boulevard, Hollywood."

Without analysis the same appears with reference to the corporation's participation in the application as in the original proceeding. The phrase "J. Zastrow requests" is meaningless, inasmuch as the corporation, under its seal

and with the signature of its manager, signed the application, thereby adopting the statements therein contained. On January 20, 1930, the permit was issued by the corporation commissioner authorizing J. Zastrow to act as the agent of North American Bond & Mortgage Company in the sale of its securities, in accordance with the permit issued the corporation on June 12, 1922. We note again the specific tie-in with the securities of North American. It is beyond reason to even think that this application, as well as the former, was not on the express request and with the full knowledge of the corporation, and likewise the permits issued on the applications. It is interesting to note the comment of the trial judge, as follows: ''I haven't any doubt after examining that paper that the application was as much that of the North American Bond & Mortgage Company as it is of Zastrow.''

And thus we find Zastrow on the dates in question, namely, during April of 1930, again presented to an investing public as the duly chosen and authorized agent of North American. The same found fraudulent representations were made and the same findings of fraud and reliance are made as to Zastrow's dealings with Mrs. Damerel as were found in the McClain case. Likewise there were exactly the same fraudulent and false statements broadcast by the North American Company during the period of the Damerel transactions. After the sale of April 24, 1930, wherein and whereby North American received the $3,000 by check, Zastrow again sought out Mrs. Damerel, on or about April 25, 1930, and finding her without further ready means he prevailed upon her to dispose of other securities she then held. Mrs. Damerel was the owner of a trust deed securing an obligation in the amount of $4,500, wherein the obligors were named Wilson, and this has been referred to as the Wilson-Damerel note. Zastrow assured Mrs. Damerel that the North American Company would buy the note and that she could then invest the proceeds in North American. Accordingly she turned the note and trust deed over to Zastrow and in a few days he returned, assuring her that the North American Company had made investigation and found the note and security sound. Thereupon Zastrow gave to Mrs. Damerel the check of North American for $4,200, being the then present value thereof after discount

to equate interest. This check she immediately indorsed over to North American, and adding a $300 check payable to that concern, she made a purchase of 45 shares of North American at the price of $100 per share. On April 24, 1930, Mrs. Damerel received a letter on the stationery of the North American Bond & Mortgage Company, which letter is as follows, omitting address:

"Dear Mrs. Damerel: We wish to confirm your purchase of thirty shares of North American Bond & Mortgage Company and to thank you for your committment. The certificate will be delivered by our Mr. Zastrow at an early date.

"Very truly yours,
"D. TACKABERRY,
"Manager Securities Department."

On April 28, 1930, after the purchase of the 45 shares, Mrs. Damerel received an acknowledgment in practically the same form, omitting only any reference to Zastrow.

Beesemyer, upon his examination as a witness, testified that he did not recall whether he as manager of North American or the officers and directors of that company knew that Tackaberry was holding himself out as manager of the securities department of North American; that he had many talks with Tackaberry but did not remember whether he saw any of the letters mailed out by Tackaberry to purchasers on the form noted. He stated that he may have seen such letters but paid no attention to them. His answer, *verbatim,* was: "No, I don't recall. At the same time I would have had no objection to it particularly. It helped him with his business, and I was always anxious to have anybody make money." Tackaberry was a stockbroker with offices in the same building as Beesemyer. The latter's testimony regarding Tackaberry is as follows: "Mr. Tackaberry sold many stocks that the North American Bond & Mortgage Company wished to sell; other securities he didn't handle as a general rule, and being in a general stock selling business he more or less took it upon himself to consider himself as manager of securities for us, but he wasn't. Emphatically he was not an employee drawing a salary of the company." However, holding himself out as manager of securities, with full knowledge and acquiescence of the North American, would suffice, in

view of the lack of knowledge on the part of those relying upon the appearances.

■ The foregoing presents the first question on the appeal, namely, the status of Zastrow in his dealings with appellants. The trial court found that at no time was Joe Zastrow the agent of North American to sell any stock to either plaintiff, and that said Zastrow did not act within the course and scope of his authority as a stock salesman of and for North American in any of the transactions with either plaintiff. The evidence does not support nor justify such a finding. The facts are undisputed, and in passing we may note that neither side called Zastrow as a witness. The explanation of defendant was that Zastrow had been contacted and that he warned defendant that if he were called he would "fix" the defendant. He was not called. Zastrow was definitely designated to the Commissioner of Corporations as the agent of respondent, and he entered directly upon the work specified in the creation of the agency. By indorsements of the various checks, by acknowledgment of subscriptions, by retention of the proceeds of sale, the respondent company unequivocally held out Zastrow, not only to appellants but to the world at large, as its representative. The purpose of the Corporate Securities Act and of all similar legislation is primarily to give to the public assurance of the integrity and authority of those agents or brokers licensed thereunder. And such purpose would be aborted and rendered of no avail if the solemn assertions of those seeking permission to operate under the statute were held meaningless. The evidence herein permits of but one conclusion, namely, that Zastrow, when he dealt with the appellants herein, dealt with them and each of them as the authorized agent of respondent corporation, and that the latter is estopped to deny his authority.

■ We now come to the real defense of the corporation, and here too it may be noted that the main facts are in little dispute and may be narrated as illustrative of the conditions existing in so far as the internal affairs of the company may be concerned. North American, during the years 1929 and 1930, had no treasury stock for sale. No resolution or other act of its board of directors authorized the offering to the public of any of the company's treasury

stock, preferred or common. Beesemyer was the manager of the corporation, and in direct and full control of the books, records and finances thereof. The directors met every week but seemed to know very little of the business that was transacted. The corporation, as far as its actual management went, was just another designation for Beesemyer. There were a number of employees, classed as secretaries, assistant secretaries, clerks, transfer agents, etc. Each of these worked under the supervision of Beesemyer and under his orders. It seems that Beesemyer personally owned considerable stock in the corporation. The fact is that the stock that was sold to the appellants herein was the personally owned stock of Beesemyer. The *modus operandi* was to send out an agent ostensibly representing the corporation, backed up by an advance advertising campaign, and have him contact prospects to whom he would unfold the story of opportunity knocking and ready and sure profits. The agent would procure a purchaser who believed he or she was dealing with the corporation. The money received would go directely to the corporation and into its funds. Then Beesemyer would dig out a certificate of his own holdings and cause to be made a transfer thereof in the amount required. Then the corporation would, under the heading in its books "Exchange", pay out the money it had received to Beesemyer. Every step in the proceeding was done by the employees of the corporation in their respective positions as employees of the company and under the specific direction of its manager. There is no evidence to support even an inference that the acts of the corporation agents and secretaries were other than routine. No suggestion of fraud or dishonesty attaches to any of these employees. In other words, each and every act done by any of them was done as part of the routine work of the corporation and under the direction of the managing agent, whose directions they were in duty bound to follow without question. And on the face of these instructions they were not warranted in assuming any irregularity. We dwell thus on this phase of the case merely to emphasize the extent to which the corporation lent itself to the accomplishment of whatever Beesemyer planned.

The Wilson-Damerel trust deed and note were purchased directly by North American Company and its check

paid for the same. The method of transfer was directed not by Beesemyer but by another official of the corporation. When purchasers of stock delivered their check to North American and the latter acknowledged receipt thereof by indorsement and the funds derived therefrom went into the account of the corporation, the transaction was identical with one wherein the purchaser delivered at the receiving window of the corporation the money in cash. The corporation got the money, and whatever it may have done with it thereafter is a matter that does not affect the rights or equities of the appellants herein. The stock transfer books of the corporation were under the exclusive control of Beesemyer, and according to the testimony the entries in the stock-book were mere matters of "automatic procedure". In fact, everything was on corporation routine and schedule, attested as to genuineness by corporate seal and entry up to the time of distribution of the spoils. The procedure parallels that of an employee taking the cash out of the till, and it seems certain that no defense would exist in favor of a merchant against his creditors from the fact that his cashier decamped with the assets.

To review all of the authorities on corporate liability, *ultra vires,* fraud and ratification would be a gigantic task and one yielding naught but academic conclusions. It seems a model case for the application of the recognized rule that when one of two innocent persons must suffer by the act of a third, he by whose negligence it happened must be the sufferer. This rule is discussed in *Lynch* v. *International Banking Co.,* 68 Cal. App. 432 [229 Pac. 968], where many authorities in support are cited. See, also, *Schumann-Heink & Co.* v. *United States Nat. Bank,* 108 Cal. App. 223 [291 Pac. 684, 292 Pac. 547]; *Green* v. *Caribou Oil Min. Co.,* 179 Cal. 790 [178 Pac. 950]; *Mac-Donald* v. *Reich & Lievre, Inc.,* 100 Cal. App. 736 [281 Pac. 106]. ■ Respondent repeatedly asserts that in an action for money had and received it must definitely appear that defendant has been "unjustly enriched". This does not mean that the evidence must show that such riches have been retained by the defendant up to the time of trial. The evidence here shows that North American received the money and disbursed it at the instance of its manager. It is practically the same as though North

American had sold the stock and then gone in the open market and purchased enough to meet the order. Let us suppose that instead of Beesemyer transferring his own stock to plaintiffs he, as manager and secretary, had taken from the funds of the company money sufficient to procure the necessary number of shares and then completed the sale to plaintiffs. It could not be successfully claimed that the corporation had not received anything from plaintiffs, for the reason that in order to consummate the fraud it was necessary to secure the stock elsewhere and thus partially use the funds obtained. The corporation was enriched and its funds increased. How these funds were distributed does not affect plaintiffs' cause of action.

Summing up, we find a fraudulent transaction carried on by and through a corporation in the accomplishment of which every corporate agency was involved, from the manager down to the office boy. And because when the fraud was done and completed one was somewhat faster and secured the profits, the corporation disclaims any liability. The entire transaction is slightly hazy. One might easily infer that if at any stage of the proceedings up to the kill a question had been raised as to the genuineness or fairness of the transaction, or if the honesty and integrity of the management had been assailed, a chorus of indignant protest would have arisen within the sacrosanct confines of this fortress of fraud. The idea of incorporation has worked out as a convenient aid to modern business, and the efficacy and usefulness of this form of business entity cannot be questioned. But withal corporations are creatures of the law and exist only at the pleasure of the law. Whenever the corporate entity is urged as a shield for wrongdoing the courts have not been backward in beating down the defense in an endeavor to preserve the equality of simple justice. The instant case depicts a sidelight on the old, old story of human greed and lust for power and pelf. If the law is powerless to interfere merely, forsooth, because one party has clothed itself in habiliments of modest corporate pattern, supplied by the very authority it seeks to destroy, then indeed has the time arrived when the law has devoured itself and in sickened surfeit yields up its existence.

■ The claim is urged that the Wilson-Damerel note and trust agreement came into the hands of the North American Company as a negotiable instrument before maturity, and was by it purchased in good faith and for value from Beesemyer, and that the corporation is a holder of said note free from all claims of plaintiff Damerel. The note was purchased by the corporation itself, direct from Mrs. Damerel, and was obtained through fraudulent representations. As a matter of fact, the transaction on the note was what is commonly termed a "wash" transaction. The mechanics of purchase and sale were employed, but in fact and reality it was merely a transfer of the note for the stock sold. And further, respondent's strenuous contention on this score almost demonstrates the weakness of all of its claims, because here it not only admits but urges the knowledge of the corporation and the regularity of the acts of its agents and employees. The transaction of purchase of the note was between the corporation and Mrs. Damerel. The purchase price was paid by a check of the corporation and the check indorsed back directly to the corporation in return for stock. On this transfer the title passed from Mrs. Damerel direct to the company. The claim of the corporation that the manager, Beesemyer, intercepted the note in transit and made himself the purchaser and then resold it to the corporation presents a situation where corporate knowledge must be presumed. In other words, the corporation cannot urge the fraud of its own agent as against Mrs. Damerel to establish the good faith of the transaction. Mrs. Damerel exchanged the Wilson note for the stock of the corporation and dealt directly with the corporation. If in the internal management of the company its manager or secretary embezzled the amount paid, that is no concern of Mrs. Damerel; nor is it a defense to the claim of fraud in the procurement of the Wilson note.

We are of the opinion that appellants, and each of them, have shown that the corporation received the money and note, and, dependent upon the solution of other questions hereinafter presented, are entitled to recover in the present action.

The final points presented regard the sufficiency and promptness of the rescission. Here again we take up the

case of each plaintiff separately, for the reason that the facts differ in each and there is not the slightest privity or jointure between the plaintiffs. We will take first the case of Olivia McClain. The finding of the trial court is as follows: "That it is not true that on or about the 27th day of February, 1931, Olivia McClain discovered for the first time the falsity and untruth of the representations set forth in plaintiff's complaint and it is not true that prior to said date said plaintiff had no knowledge whatsoever concerning the falsity of said representations; that in truth and in fact plaintiff knew, or could have known by the inspection of the financial statements of North American Bond and Mortgage Company at its office and on file in the office of the corporation commissioner of the state of California, of the falsity of said statements immediately after the purchase of her said stock at the times referred to in plaintiff's complaint. That plaintiff Olivia McClain on and after December 12th, 1930, learned of the financial condition and affairs of said defendant North American Bond and Mortgage Company and ascertained that said company had many unsecured loans and many financial losses on account thereof and owned stock in various companies, and notwithstanding said knowledge plaintiff Olivia McClain on January 20th, 1930, attended a stockholders' meeting of the defendant North American Bond and Mortgage Company and voted the shares of stock referred to in the complaint of said Olivia McClain at said stockholders' meeting." The court further found that Mrs. McClain became a stockholder on July 15, 1929, and that at all times since becoming such stockholder she exercised certain rights as such, and executed and delivered a proxy to Beesemyer to act for her in all of the affairs of the corporation; and that by the appointment of Beesemyer and his acting as her agent through the proxy she was and is charged with the knowledge of Beesemyer. The evidence in support of the first finding quoted in full may be reviewed.

It appears that in December of 1930 the collapse came and was a matter of grave public interest. Beesemyer was arrested and charged with certain criminal offenses. The whole affair was given wide publicity. On December 12th of that year Beesemyer made open confession of his de-

linquency. This confession was published in full in the daily press and Mrs. McClain admits knowledge thereof. The confession was in evidence herein, and the portion thereof referring to North American Bond & Mortgage Company is as follows: "I further state that I falsified the records of the North American Bond and Mortgage Company and the Guaranty Holding Corporation and misappropriated large sums of money belonging to said institutions for my own personal use, and that such acts done by me in connection therewith were also done without the knowledge or consent of any of the directors or officers of either of these institutions." The fraud found consisted in false representations as to the assets of the North American and the nature of its securities and its dividend paying record.

We fail to see where this confession could put anyone on notice or convey any information on that subject. By the wildest stretch of the imagination one could not infer that there is anything particularly dishonest or corrupt in the victim of a theft. The fact that B holds up and robs A does not give rise to any suspicion that A was a thief.

The court in its findings holds that Olivia McClain could have learned the falsity of the representations by going to the office of the corporation commissioner and examining the records of that office. No such duty was placed upon her. (*McKeehan* v. *Pacific Finance Co.*, 120 Cal. App. 578 [8 Pac. (2d) 213]; *Tatterson* v. *Kehrlein*, 88 Cal. App. 34 [263 Pac. 285]; *Zwart* v. *Landfield*, 93 Cal. App. 328 [269 Pac. 740]; *DeGarmo* v. *Petitfils Confiserie*, 93 Cal. App. 261 [269 Pac. 692]; *French* v. *Freeman*, 191 Cal. 579 [217 Pac. 515]; *MacDonald* v. *Reich & Lievre, Inc.*, *supra*.) In *French* v. *Freeman*, *supra*, at page 587, it is said, quoting from Pomeroy's Equity Jurisprudence: "The mere existence of opportunities for examination, or of sources of information, is not sufficient, even though by means of these opportunities and sources, in the absence of any representation at all, a constructive notice to the party would be inferred; the doctrine of constructive notice does not apply where there has been such a representation of fact." The cited cases amplify this doctrine and affirm it. The finding as to the proxy given Beesemyer having the effect of charging Mrs. McClain with all of the knowledge of Beesemyer finds no support in law or in the facts here. The

obtaining of the proxy was a part of the fraud perpetrated by and through the corporate agency. The proxy in any event simply authorized Beesemyer to vote the stock at any election of directors or at any other election held for any purpose, and to vote the stock at any meeting of the stockholders on any question voted on at such meeting. Beesemyer had no proxy to falsify or alter records, and the knowledge that he acquired through such methods was adverse to the stockholder and not imputed to her. (1 Cal. Jur. 852.)

It appeared in evidence that shortly after December 12, 1930, the date of the Beesemyer confession, there was much activity amongst the unfortunate stockholders of North American. Mrs. McClain was much distressed and telephoned to the corporation offices seeking information and advice both as to the condition of the company and her individual liability. She was always given encouraging reports. On January 20, 1931, there was a meeting of the stockholders, at which time and place there was a general discussion of the corporate affairs. Mrs. McClain attended the meeting. A partial audit was read and some discussion thereon had, it being expressly stated by the reporting auditor that the report was incomplete and subject to further investigation and report. The general information given was sufficient to arise a suspicion of the falsity of the representations made at the time Mrs. McClain purchased the stock. Mrs. McClain, being an elderly woman, testified that the whole proceeding was Greek to her; that there was much confusion and excitement at the meeting and that she heard nothing that was said. At the conclusion of the meeting, or at least during some part thereof, the stockholders present by ballot selected a committee to represent them. Mrs. McClain voted a ticket that was given her, voting her 270 shares of stock for seven directors. There is no evidence contradictory to that of Mrs. McClain on the question of her participation in the stockholders' meeting, and nothing negativing her statement that she heard nothing that transpired. Shortly thereafter, she did begin an investigation and on February 27, 1931, served her notice of rescission upon the respondent company.

█ Conceding that Mrs. McClain was put upon inquiry on the 20th of January, the rescission on February 27th,

hardly more than a month thereafter, should not of itself be held too late. It took from December 12, 1930, to January 20, 1931, for the experts to prepare a partial report for the stockholders, so it would seem rather fast for appellant to acquire full knowledge in practically the same time as it took the expert accountants. The fact that Mrs. McClain gave no notice of rescission to Zastrow or to Beesemyer is immaterial, in view of what has heretofore been stated.

Coming now to the case of Mrs. Damerel on the question of promptness of rescission. Mrs. Damerel did not attend any stockholders' meeting; otherwise the same findings were made as to her knowledge and presumed knowledge. The same conclusion is reached by us and the same authorities applied. She, too, gave a proxy to Beesemyer. The finding of the court as to both appellants is that "in truth and in fact no rescission was effected". While this might properly be classed as a conclusion of law, it appears as a finding of fact following the findings of facts from which such conclusion was drawn. These facts are that plaintiffs did not tender back everything of value by them received by virtue of the purchase of the stock. The direct finding is that both plaintiffs, while holding the stock, received certain dividends which they did not tender back upon the attempted rescission.

There are two answers to this argument. Upon receipt of the notice of rescission respondent company made no objection to the tender and distinctly repudiated and denied any liability. The attitude of the corporation was such as to indicate that regardless of what was tendered it would not recognize the rescissions. (Sec. 2076, Code Civ. Proc.) Quoting from *DeGarmo* v. *Petitfils Confiserie*, 93 Cal. App. 261 [269 Pac. 692, 697] : "If appellant fails in the present action he will be entitled to retain the $500 dividend; if he succeeds in the action he will be entitled to retain the $500 as a partial restoration of the $20,000 and have judgment against defendant for the balance. In no event, therefore, could defendant be possibly injured." The same doctrine is announced in *Kales* v. *Houghton*, 190 Cal. 294 [212 Pac. 21]. It would have been a hazardous thing for these plaintiffs to turn back to the corporation some $3,000 in cash at a time when such pandemonium pre-

vailed. The money, once in the corporate treasury, may or may not have been sufficiently marked to permit recovery. The probability was that immediately a thousand hands would have been reaching for it. The rules regarding promptness of rescission and restoration of benefits are of equitable cognizance and intended to promote justice rather than to impede it. Accordingly, where no injury follows a slight delay in discovery or in pursuing the means of discovery, little importance will attach thereto. We concede that the question of promptness is primarily one for the trial court, but there must be some substantial evidence supporting a finding that precludes recovery on this ground.

Other questions presented by appellants require no discussion.

The judgment is reversed.

Works, P. J., and Stephens, J., concurred.