[Civ. No. 6067.   Fourth Dist.   May 26, 1960.]

C. TALBOT, Respondent, v. FRESNO-PACIFIC CORPORA-
TION (a Corporation), Defendant; DOROTHY R. LEE,
Appellant.

Truman F. Campbell and Evans, Schroeder & Campbell for
Appellant.

Ralph Robinson for Respondent.

GRIFFIN, P. J.—Plaintiff and respondent, as assignee of E. A. Padula Lumber Company, brought this action against defendant Fresno-Pacific Corporation and defendant and appellant Dorothy R. Lee setting forth five causes of action to recover $7,280.38 representing the price of lumber sold to defendants. The first three causes of action were based on common counts. The fourth cause of action alleges independent liability of Dorothy R. Lee by virtue of a guaranty and the fifth cause of action alleges her liability under an *alter ego* theory.

The findings and ultimate judgment in the sum sought were decided in favor of plaintiff and against both defendants on one of the common counts and also on the fifth cause of action.

Stripped of unnecessary minutiae, the principal question here involved is whether the evidence supports the fifth cause of action finding that defendant Dorothy R. Lee was the *alter ego* of the defendant Fresno-Pacific Corporation and vice versa and was accordingly individually liable for the debt and whether the evidence and findings support the judgment, particularly as to plaintiff's *equitable* right to recover against her as an individual.

Dorothy R. Lee, as an individual, was conducting a lumber business in Fresno and Merced under the firm name and style of Sequoia Lumber Sales. Subsequently, about September 10, 1957, she formed the defendant corporation, Fresno-Pacific Corporation, and at that time also formed a corporation called Sequoia Enterprises, Inc. It is conceded that Mrs. Lee owned all stock issued by both corporations. Apparently without plaintiff's knowledge, on September 19, 1957, she filed a certificate of abandonment of the name ''Sequoia Lumber Sales'' and the defendant corporation filed a certificate indicating that it was doing business under the fictitious name of ''Sequoia Lumber Sales.''

Between August 23, 1958, and December 29, 1958, plaintiff's assignor, doing business at Willits, California, sold to Sequoia Lumber Sales lumber in the reasonable value of $7,280.38, which amount was due to plaintiff on January 1, 1959. It is alleged that plaintiff's assignor believed at the time that the sale was being made to defendant Dorothy Lee, doing business as Sequoia Lumber Sales.

Mrs. Lee, on forming the corporations, transferred her inventory of lumber, accounts receivable and payable from her former business, Sequoia Lumber Sales, to defendant corporation, and this corporation assumed all liabilities on the books of

the lumber company operated by her as Sequoia Lumber Sales. She transferred to Sequoia Enterprises the fixed assets of that company and certain equipment together with a building located on leased land. It is conceded that Mrs. Lee was president of and dominated and controlled both corporations. It is alleged in the amended complaint that, under some secret agreement, Sequoia Lumber Sales leased to Fresno-Pacific Corporation automotive equipment, a building and furniture and fixed assets, and written leases were drawn up between the two corporations with Mrs. Lee, as president, signing for both corporations.

The court found that these transfers and conveyances to these two corporations from Mrs. Lee were made without adequate or sufficient consideration and were made with deliberate intent to hinder, delay and defraud existing and subsequent creditors of Fresno-Pacific Corporation, doing business as Sequoia Lumber Sales, and that the two corporations, acting through their president and sole stockholder, received such conveyances with knowledge of said fraudulent intent and for this purpose; that Fresno-Pacific Corporation had been insolvent since January 1, 1959, and had been unable to pay its creditors, including plaintiff. The amended complaint alleges that just prior to the filing of the complaint in this action, defendant Fresno-Pacific Corporation, acting through its president and only stockholder, sold all of the merchantable lumber left in its yard and, in order to collect money therefor, granted to its customers an additional discount of 10 per cent for cash; that these funds were not deposited in the bank account of said defendant corporation but were delivered personally to defendant Lee with the deliberate intent of defrauding existing creditors; that these transfers rendered defendant corporation insolvent and its *alter ego* corporation, Sequoia Enterprises, Inc., and defendant Lee were then and now are solvent. The trial court so found.

It does appear from the evidence and minute books of the respective corporations that the president and directors of both corporations were the same; that defendant Lee owned all of the stock; that one Reichel, her former son-in-law, who lived in the same home with her, was vice president and acted as manager of both corporations, and one Quinn, an accountant with no interest in either corporation, who apparently never attended any regular meetings of the board of directors (if any were held), was secretary-treasurer but never had access to

any money or signed any check or had the right to do so for the corporation.

Fresno-Pacific Corporation conducted its business at the same location where Mrs. Lee formerly operated as an individual, with the same personnel and same manager. In 1957 she, apparently, as Sequoia Lumber Sales, became financially involved and owed considerable money for lumber furnished to her. She was personally trying to pay on some of the obligations of the defendant corporation, through plaintiff's attorney's office. Liabilities of Sequoia Lumber Sales, assumed by defendant corporation, exceeded its cash on hand and the only assets available for its creditors was lumber on hand and the accounts receivable which were offset by accounts payable. When defendant corporation was formed, Mrs. Lee owed $3,000 to the bank on her personal business and defendant corporation took over this liability. Fresno-Pacific Corporation loaned Sequoia Enterprises $1,000 to buy a resaw machine and then Sequoia Enterprises leased the resaw machine to Fresno-Pacific Corporation. On March 3, defendant corporation borrowed $1,800 from Sequoia Enterprises, Inc. As to these latter transactions, defendant Lee testified that the question of lending back and forth between these two corporations was her determination alone and that there was no independent action on behalf of either corporation. In an application to the corporation commissioner for a permit, a $3,000 note of defendant corporation, payable to Mrs. Lee, was omitted from the statement of assets and liabilities. Just before the defendant corporation went out of business, $1,000 was voted out to one Robbins as being the value of a share of stock promised to him, without a formal meeting of the board of directors, as a bonus for claimed overtime work, in the absence of director Quinn. Mrs. Lee kept the books for both corporations and received $75 per week, paid by defendant corporation. About January 16, 1959 she paid $1,200 from the funds of defendant corporation in satisfaction of an indebtedness of D. R. Lee Company for which she was probably personally liable. At the close of 1958 defendant corporation owed between fifteen and twenty thousand dollars. On the day the attachment was levied in the instant action, there was about $4,786 in Mrs. Lee's or Reichel's possession in a dresser drawer of their home or in a friend's safe. She claimed this action was done on the advice of her counsel. It appears that Quinn was not present at any formal meeting of the board of directors, although the minutes of such claimed meetings indicated his presence.

All fixed assets had been placed in the Sequoia Enterprises, Inc. corporation beyond the reach of the creditors. A bank account was opened for defendant corporation about July 1958 and closed in January 1959. After defendant corporation's business was closed, the office equipment was moved to the residence occupied by Mrs. Lee and Mr. Reichel, which residence belonged to Sequoia Enterprises, Inc., and for which neither of these parties paid any rent for such occupancy. After the incorporation of defendant corporation, Sequoia Lumber Sales continued to use the same letterheads, billheads, invoices and purchase orders which had formerly been used by Mrs. Lee doing business as Sequoia Lumber Company. Certain communications in evidence substantiate plaintiff's claim that defendant Lee led plaintiff's assignor to believe that she held herself out as being individually liable for his account and that such arrangement would continue. A letter in evidence dated November 21, 1956, from plaintiff's assignor to D. R. Lee Lumber Company, attention Mrs. Lee, asked her:

"For the purpose of our company selling your company, lumber on a credit basis, we would appreciate your letting us know the names of the partnership of the D. R. Lee Lumber Company. Also, with a continuing guarantee in writing by the partners, to pay all invoices on due date."

This letter was answered by Mrs. Lee on December 15, 1956, as follows: ". . . this firm is a proprietary business, and I am the sole owner. There are no partners. All invoices presented to us by your company, will be paid on or before the due date."

On December 17 she, in person, wired plaintiff's assignor "Credit guarantee mailed as requested . . ." On March 27, 1957, plaintiff's assignor wrote her: "It is our understanding that the D. R. Lee Lumber Sales is changing its trade name to Sequoia Lumber Sales. Also, that the principals and organizational structure remain the same. We request a letter from you to guarantee the invoices from our Company to the Sequoia Lumber Sales, the same as we have on file only under the D. R. Lee Lumber Co."

On March 30 Mrs. Lee replied: "With reference to your recent letter, the "Sequoia Lumber Sales" organization is exactly the same as its predecessor, "D. R. Lee" in its personnel, capital, and locations. Be assured your billings will receive the same prompt handling as before ..."

In April and May 1958 plaintiff's assignor was trying to

collect his accounts from defendant corporation doing business as Sequoia Lumber Sales.

In explanation, Mrs. Lee stated that she had assets which she desired to place in a corporation, but which were not related in any manner to her lumber business; that at the time of the formation of the two corporations her lumber business was growing rapidly and that, primarly for tax purposes, as explained to her by her attorney and her accountant, it was deemed wise to set up two corporations rather than one; that the exact set-up was explained to plaintiff's assignor; that the same stationery was used after the incorporation, but this was necessitated by the use of the same fictitious name for doing business, and the fictitious name was duly and regularly abandoned by the unincorporated business and duly and regularly adopted by the defendant corporation; that in January 1959 when the plaintiff's assignor filed this lawsuit and attached the property of the defendants, the corporation started operating on a cash basis; that the purpose of this was to collect the money due the corporation and to pay such debts of the corporation as they were able to pay with the available funds; that there was not a sufficient amount to pay all creditors in full, so they concluded it wisest to pay all small creditors first; that the accounts paid were not accounts upon which Mrs. Lee was personally liable; that in some instances the accounts were accounts that she had dealt with prior to her incorporation but they were running accounts, and the balance due at the time paid was not necessarily a balance that had been due prior to the incorporation; that these creditors paid were not favored creditors; that the funds were actually used to pay legitimate obligations of the corporation; and that they were not channeled into the hands of Mrs. Lee or in any manner to benefit her personally or her other corporation.

She argues that the evidence above-related as to the actions taken by her bore only on the question of her domination and control of the several corporations and she concedes this issue; that this evidence may show a failure on her part to follow corporate formalities but no inequitable result to the creditors followed; that the funds withdrawn from the defendant corporation's bank account just before the attachment was levied were actually and in good faith used for the payment of legitimate obligations of the corporation; that there were not sufficient funds to pay large creditors, such as plaintiff's assignor, so they paid smaller creditors in order

to pay off as many bills as possible; that plaintiff's assignor knew that he was dealing with defendant corporation as such and, knowing its financial condition, continued to deal with it, and he should have taken immediate steps to protect himself, and accordingly he should now be precluded from holding defendant individually liable under any equitable theory. It is further argued that on January 9, 1959, plaintiff's assignor was offered an inventory of lumber in payment of the debt owing and he refused this offer. It is argued that this is evidence of good faith on the part of defendants. In support of these claims, defendants cite such authorities as *Automotriz etc. De California* v. *Resnick*, 47 Cal.2d 792 [306 P.2d 1, 63 A.L.R.2d 1042]; *Riddle* v. *Leuschner*, 51 Cal.2d 574 [335 P.2d 107]; *Lynch* v. *McDonald*, 155 Cal. 704 [102 P. 918]; *Hiehle* v. *Torrance Millworks, Inc.*, 126 Cal.App.2d 624 [272 P.2d 780].

In *Temple* v. *Bodega Bay Fisheries, Inc.*, 180 Cal. App.2d 279 [4 Cal.Rptr. 300], supported by other authorities relied upon by these respective parties, the general rule is stated to be that:

''Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.''

It was also held that ''Inadequate capitalization may be considered as a factor in determining whether the corporate entity should be disregarded.'' (*Grant* v. *United States Electronics Corp.*, 125 Cal.App.2d 193 [270 P.2d 64]; *Record etc. Co.* v. *Pageman Holding Corp.*, 132 Cal.App.2d 821 [283 P.2d 724]; *Hiehle* v. *Torrance Millworks, Inc., supra*; *Marr* v. *Postal Union Life Ins. Co.*, 40 Cal.App.2d 673 [105 P.2d 649].)

The doctrine does not depend on the presence of actual fraud. It is designed to avoid or prevent what would be fraud or injustice, if accomplished. (*Wenban Estate, Inc.* v. *Hewlett*, 193 Cal. 675 [227 P. 723]; *Wilson* v. *Stearns*, 123 Cal.App.2d 472 [267 P.2d 59]; *Consolidated etc. Industries* v. *Marks*, 109 Cal.App.2d 310 [240 P.2d 718].)

It is pointed out by defendants that the mere circumstance that all of the capital stock of a corporation is owned or controlled by one or more persons does not destroy its separate existence; and the situation presented must demand that the corporate entity be ignored in order that fraud or some kindred wrong may be defeated. (*Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 P. 641]; *Norins Realty Co.* v. *Consolidated A. & T. G. Co.,* 80 Cal.App.2d 879 [182 P.2d 593].) ■ A wrongdoer may not urge separate entity as a shield. (*Damerel* v. *North American Bond & Mortgage Co.,* 133 Cal.App. 290 [24 P.2d 237].) The corporate veil may at times be pierced to do equity and justice, but never to accomplish the reverse. (*In re Hedgeside Distillery Corp.,* 123 F.Supp. 933, affirmed in *Anglo California National Bank of San Francisco* v. *Schenley Industries, Inc.,* 215 F.2d 651.) ■ Equity will lift the corporate mask and identify the person behind it when a business corporation reorganizes under a new name, with practically the same stockholders and directors, to carry on the former business with the design of avoiding the liabilities of the original company. (*Stanford Hotel Co.* v. *M. Schwind Co.,* 180 Cal. 348 [181 P. 780].) The law as to whether courts will pierce the corporate veil is easy to state but difficult to apply. In *Stark* v. *Coker,* 20 Cal.2d 839, 846 [129 P.2d 390], the court stated:

"The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court. Only general rules may be laid down for guidance."

From a recitation of the facts, of which some are in conflict, and the application of the rules in the cases above-cited, it appears to us that there was sufficient evidence to support the findings of the court and judgment entered.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied June 21, 1960, and appellant's petition for a hearing by the Supreme Court was denied July 20, 1960.