[Civ. No. 6319. First Appellate District, Division Two.—July 26, 1928.]

G. C. De GARMO, Appellant, v. PETITFILS CONFISERIE (a Corporation), Respondent.

G. P. Adams, W. W. Orme, G. C. De Garmo, *in pro. per.*, and H. B. Cornell for Appellant.

Gibson, Dunn & Crutcher and **H. F.** Prince for Respondent.

PRESTON (H. L.), P. J., *pro tem.*—The plaintiff G. C. De Garmo purchased from defendant corporation 200 shares of its capital stock for which he paid $20,000. This is an action by plaintiff to rescind that purchase on the ground of fraud and misrepresentations.

The case was tried before the court sitting without a jury, and findings and judgment were in favor of defendant, from which judgment plaintiff prosecutes this appeal.

Appellant strenuously contends that the findings on all material issues are contrary to the uncontradicted evidence.

We think that this contention must be sustained.

The complaint alleges, among other things, that defendant, for the purpose of inducing plaintiff to purchase its stock, stated and represented to him: (1) That the company had already paid two quarterly dividends of five per cent each; (2) That the then present earnings of the company were sufficient to enable it to pay regular five per cent quarterly dividends thereafter; (3) That nothing had been paid to W. M. Petitfils for the goodwill of his business; (4) That the company had been offered $400,000 for the lease on store No. 1, which was the original store of Petitfils; (5) That W. M. Petitfils would continue to manage and devote his entire time to the business and that he would retain his stock in the company.

The complaint further alleges that the foregoing statements and representations were false, untrue, and misleading in the following particulars: (1) That said dividends were not paid out of the net earnings of defendant, but only as the result of changing and falsifying its books, and for the sole purpose of defrauding, deceiving, and misleading prospective purchasers of its stock, etc.; (2) That the net earnings of the company were not at any time sufficient to pay any dividends and that defendant knew this at the time of making the foregoing statements and representations; (3) That W. M. Petitfils received $180,000 for the goodwill of his business; (4) That the lease on store No. 1 was not of the value represented by defendant; (5) That prior to soliciting plaintiff to purchase stock, W. M. Petitfils had entered into a secret agreement with one Beecher Laswell to sell his personal stock in the company.

The answer traverses practically all of the allegations of the complaint, and alleges the following special defenses: (1) That if any misrepresentations or false statements were made by defendant concerning the stock, they were made by Beecher Laswell, who was an independent contractor for the sale of defendant's capital stock, and that defendant believed that the net earnings of the company were sufficient to warrant the payment of said dividends and each of them; (2) That plaintiff was guilty of laches in not attempting to rescind promptly.

The court found, among other things, that Beecher Laswell was the agent of defendant corporation, and that one

R. J. Leavitt was an employee of Laswell, and that the said Leavitt solicited plaintiff to purchase stock and made the following representations for the purpose of inducing plaintiff to purchase stock in the defendant corporation: (1) That the average daily receipts from store No. 1 were slightly under $2,000; (2) That the daily receipts from store No. 2 were about $1,100; (3) That the daily receipts from store No. 3 were about $900; (4) That the company had been offered $400,000 for a cancellation of the lease on store No. 1; (5) That Rowan & Company had said that although it was difficult to appraise the lease on the Flower Street property, owned by the company, because of the fact that it was increasing so rapidly in value, that it was worth about $1,000,000; (6) That it was the intention of the company to open another store on or near Seventh Street in the City of Los Angeles; (7) That the company had paid two dividends of five per cent each; (8) That Petitfils expected to stay with the business and to stay in charge of it and to keep his stock in the company.

The court also found that said R. J. Leavitt delivered to plaintiff certain circular letters referring to said company, prepared by Beecher Laswell, with the approval of the company.

The court further found that representations designated above as Nos. 1, 2, 3, 6, and 8 were true and that the representation designated as No. 7 was true, except that one dividend only was paid to the stockholders of Petitfils Confiserie, and that the representations designated as Nos. 4 and 5 were not true.

The court also made findings in effect as follows: (1) Plaintiff did not believe or rely upon the statements made to him by R. J. Leavitt; (2) That these representations were not the proximate or any cause of plaintiff purchasing his stock in defendant corporation; (3) That plaintiff relied solely upon the fact that he was acquainted with the success of W. M. Petitfils' business, and the profits made by him prior to incorporation; (4) That plaintiff did not believe or rely upon any of the statements or representations set out in the complaint in purchasing stock in the company, and that plaintiff made an independent investigation.

■ The law is well established that to entitle one to recover in rescission because of false representations, it is not sufficient to show merely that the representations were false and made with intent to deceive, *but it must also be shown that the false representations actually misled and deceived the party seeking rescission and that they were relied upon by such party.* (*Maxon-Nowlin Co.* v. *Norswing,* 166 Cal. 509 [137 Pac. 240] ; *Hallidie* v. *First Federal Trust Co.,* 177 Cal. 600 [171 Pac. 431] ; *Hackleman* v. *Lyman,* 50 Cal. App. 323 [195 Pac. 263] ; *Spinks* v. *Clark,* 147 Cal. 444 [82 Pac. 45] ; *Maggini* v. *McBain,* 65 Cal. App. 133 [223 Pac. 428] ; *Sherlock* v. *Gerlach,* 68 Cal. App. 341 [229 Pac. 65].)

Therefore, if there is sufficient evidence in the record to support the last-mentioned findings that appellant did not rely upon the representations made by defendant and its agents, and was not induced thereby to purchase the stock in question, but, on the other hand, in making the purchase he relied solely upon the fact that he was acquainted with W. M. Petitfils' business and the profits made by him prior to incorporation, then this appeal must fall and the judgment be affirmed, for these findings cover an essential element of appellant's right of action.

■ We have, however, searched the record carefully and we are unable to find any evidence that will support the findings of the trial court that appellant "did not rely upon the alleged misrepresentations and did not believe them to be true," or that he made an independent investigation.

Plaintiff testified that in October, 1923, R. J. Leavitt called upon him at his office in Los Angeles and, after introducing himself, said that he was connected with Beecher Laswell's office, a stock broker having his offices in Los Angeles, and that they were selling stock of Petitfils Confiserie; he thereupon handed plaintiff his card, reading: "Petitfils Confiserie, Fiscal Offices 610 Mortgage Guaranty Building, 626 South Spring St., Los Angeles, R. J. Leavitt, Personal Representative." That was the first of a series of conversations with Leavitt, extending up to the time the plaintiff purchased his stock in November, 1923.

Plaintiff further testified that "Leavitt said that Petitfils had incorporated the company with a capital stock of

$2,000,000 and that Petitfils had taken part of the stock; and he told me the number of shares, 3150 shares, I think it was, and $250,000 cash for his business. He said the company had also taken over the business of the Brown Candy Company that was operating two chocolate shops, one on Sixth street between Spring and Broadway, and the other one on Broadway between Seventh and Eighth. He told me the number of shares that had been paid to the Brown Candy Company for that business; he said it was 5000 shares. He then told me what the income from the three stores was. At this time Petitfils Confiserie was operating a store on Sixth street between Spring and Broadway, and that store has been very frequently since then referred to as store No. 3. There was another store on Broadway between Sixth and Seventh, the main store, which we all referred to as No. 1; and another one on Broadway between Seventh and Eighth which was referred to as No. 2. I asked him if anything had been paid to Mr. Petitfils for the good will of his business and he said that nothing was paid him for that. He next took up the matter of the leases. He said that in taking over the business of Brown Candy Company, the company had acquired a very valuable lease on property on Flower street between Seventh and Eighth; that it was a 99-year lease; that they were paying a rent of only between—of either four or four hundred and fifty dollars a month. I can't be quite sure which he said. He said that the Rowan Company had appraised the lease. He said it was difficult— that the property was increasing so in value that it was really difficult to appraise, but that it was worth about a million dollars. He also said that the lease on store No. 1 had about six years yet to run, and that they had been offered $400,000 for the lease, for the reason that the owner, operating through Blumenthal & Company, was very anxious to erect a large building, a modern building on the property. He also told me that the lease on store No. 2 had about seventeen years yet to run, and that it was a very advantageous lease, and he also told me how long the lease on store No. 3 ran, but I can't remember the figures. I can only recall this, that when he had given me the values of those leases, it aggregated the capital stock of the company. . . . He also said that they would probably not

use the building they had acquired from Brown Candy Company under this 99-year lease for the reason that it would be too valuable for their purposes. We then discussed the matter of dividends. He told me that the company had paid two dividends of five per cent each. . . . That was his statement that the earnings—I can only give it to you substantially, but in effect it was that, that the earnings of the company were sufficient to enable them to pay five per cent dividends regularly from that time on quarterly.''

Plaintiff then stated that Leavitt handed him some literature concerning the company, including a statement showing the profits Petitfils had derived from the business up to the time of the incorporation of the defendant company. In the literature given to plaintiff at that time was a circular letter signed ''Petitfils Confiserie, W. M. Petitfils, President,'' containing this clause: ''On May 18, 1923, Petitfils Confiserie was incorporated under the management of Mr. W. M. Petitfils. On July 10th, a dividend of 5% was paid to all stockholders as of record on June 30th, and on October 15th, another 5% dividend was distributed to all stockholders as of record on August 31, 1923, the checks ranging in size from $5 to $14,500. This investment is now open to you for two reasons: first, it is a decided commercial asset to have a large number of stockholders; the second, now is the strategic time for expansion and development because of the remarkable success of the three established stores and the general healthy condition of Los Angeles.''

Other circular letters of a similar character, but more alluring, were given plaintiff, signed ''Petitfils Confiserie, E. A. Harter, Vice-President.'' One of the paragraphs in one of these last-mentioned circular letters is as follows: ''At one time you expressed a desire to learn the details regarding an investment in the securities of this *soundly managed, dividend-producing company*. This final effort is made, before the books are closed, to induce you to share in our investment and profits.''

Plaintiff further testified: ''When Mr. Leavitt explained why he was there and told me of the business they were doing, the money they were making, and dividends they had paid, I said, 'Mr. Leavitt, this is essentially a one-man

concern,' and I said, 'I know that Mr. Petitfils is one of the best restaurant men in Southern California.' Parenthetically, I had known Mr. Petitfils practically ever since he had been in business. I said, 'if he should leave the company or anything should happen to him it would very materially affect the business.' He said, 'We have provided for that. His life has been insured for $250,000. At one time Petitfils was tired and he wanted to quit the business,' but he said, 'he has finally made up his mind that he is going to devote his life to it, and he had promised to stay with the business, stay in charge of it, and to keep his interest, his stock in the company.' He had previously told me that Petitfils had 3150 shares of stock."

After these conversations with Leavitt, plaintiff went to the Merchants National Bank in Los Angeles to verify Leavitt's statement that Petitfils had attempted to borrow money from that bank and had been refused the loan and that he later got it from the Security Trust & Savings Bank. Plaintiff found that this statement was true. Plaintiff then sought and obtained an introduction to Mr. Sugars, another vice-president of defendant corporation, and informed Mr. Sugars that he was thinking of buying some stock in Petitfils and wanted to get some additional information. Sugars replied, "All the stores are making money." They then had a conversation about the dividends and Sugars stated, "That he saw no reason why they could not continue paying their dividends they had started." Other conversations were had between them about the receipts and other details of the business and Mr. Sugars referred plaintiff to Mr. Long, the secretary, for further information. Later plaintiff called upon Mr. Long, introduced himself, and told him that he was thinking of buying some stock in the company and that he had been referred to him by Mr. Sugars to get information concerning the business of the company. During this conversation, Mr. Petitfils and Mr. Harter came into the office and Mr. Harter was introduced to plaintiff. A short conversation was held with Mr. Harter and Mr. Petitfils, in which plaintiff told them that he was thinking of buying some stock and wanted to get some information about the business. Nothing definite was discussed by plaintiff with Mr. Petitfils and Mr. Harter, but after their departure Mr. Long and the plaintiff

had a conversation, in which Mr. Long stated: "This business carries a very large profit—sixty per cent of the receipts is net profit." Just what was said at this conversation can best be related by quoting a portion of the testimony of the plaintiff on this subject: "I then asked him about the leases. I said, 'I understand that the lease on this store,'—we were then at store No. 1—'runs for six years yet.' He said, 'Yes.' And I said, 'I understand that you have been offered $400,000 for this lease for canceling it.' He says, 'that is correct.' We next talked about the lease on the store on South Flower street. He told me substantially what Mr. Leavitt had told me, that the company had had that lease appraised, and that Rowan & Company had said it was worth about a million dollars. . . . We then talked about the dividends. I asked him about those; he said they had paid two dividends of five per cent each, and he said, 'Whether we open another store or not, the present earnings of the company are sufficient to enable us to pay five per cent quarterly dividends.' I said, 'Mr. Long, can you do that and write off the leases?' He says, 'Yes, sir, we can, and we have also provided for depreciation and contingent expense.' . . . "

After this conversation with Mr. Long, plaintiff had another conversation with Mr. Leavitt and purchased the stock.

The foregoing is all the evidence showing what plaintiff said and did, and the information he sought and received before purchasing his stock, and this evidence is uncontradicted, except that Long testified that he told plaintiff the gross receipts was between fifty and sixty per cent and that all the leases were valued at $1,000,000.

Plaintiff made no independent investigation; all the investigation that he made was with officers and agents of the defendant. He only asked one question on the outside and that was from the bank, which was concerning a wholly immaterial matter.

Plaintiff testified positively that he believed and relied upon the representations made to him and would not have purchased the stock had it not been for those representations, and that he made no further investigation other than that above stated, and there is not a fact or circumstance revealed by the record to rebut this statement.

Furthermore, the representations made to appellant were ones calculated to induce him to buy the stock and he did, in fact, make the purchase; therefore, the presumption is that the representations induced him to do so, and in order to take away his right to relief on the ground of fraud, it must be shown that he *did not rely upon said representations*. (*Troy etc. Co.* v. *Drivers' etc. Co.*, 14 Cal. App. 152–155 [111 Pac. 121]; 12 Cal. Jur. 827. See, also, *Dow* v. *Swain*, 125 Cal. 674–681 [58 Pac. 271].) We have, therefore, in the case at bar, a well-established legal presumption, which is evidence, plus the direct and positive evidence of appellant himself, that he believed and relied upon said representations made by defendant in purchasing the stock, and there is nothing in the record to rebut this evidence.

The findings of nonreliance and disbelief in said representations must fall in the face of this uncontradicted evidence.

■ Having determined that certain representations were in fact made, and that they did induce appellant to purchase the stock, the next question arises, does the evidence show these representations to be true or false? As above stated, the court found that the representation to the effect that the defendant had been offered $400,000 for the cancellation of the lease on store No. 1 was false, and also that the statement that the lease on Flower Street was worth $1,000,000 was also false. The evidence amply supports both of these findings.

The complaint alleges, that neither the July nor October dividend was paid out of the *net profits*, but merely as the result of falsifying the books and for the sole purpose of defrauding prospective purchasers of stock in the company. The court found that only one dividend was paid and "that this was not paid merely as a result of altering the books or for the sole purpose of defrauding prospective purchasers." No finding as to whether it was paid out of the profits of the company was made by the court.

The uncontradicted evidence shows that at the time appellant was being solicited by defendant to purchase the stock, he was told by Leavitt and Long that the company had paid two dividends of five per cent each. Appellant was also given several mimeographed letters,

bearing the signature of defendant, in which the same statement was made. The evidence shows that *no dividend* was paid in July, 1923.

The facts regarding the July dividend are, briefly, these: The property and assets of the Brown Candy Company, at the time it was transferred to defendant, were inventoried at $525,000; a dividend of five per cent was first paid to the stockholders of the *Brown Candy Company,* which reduced the assets of the Brown Candy Company to $500,000, and then the defendant corporation gave the Brown Candy Company 5000 shares of the capital stock of defendant corporation at $100 per share for the remaining $500,000 worth of assets of the Brown Candy Company. The $25,000 was distributed to the *stockholders of the Brown Candy Company by the defendant corporation, but it was in no sense a dividend to the stockholders of the defendant corporation and was not earned by them;* it was simply a five per cent dividend paid by the Brown Candy Company to *its own stockholders* at the time it sold out to defendant corporation.

The October dividend, which was the only one paid, was not paid out of the *net earnings or profits of the defendant.* Defendant had only been operating since June 15, 1923. The stock salesman had represented to plaintiff and other prospective purchasers that a five per cent dividend was paid on October 15, 1923, and was paid to all stockholders of record on August 31, 1923. The literature of defendant also contained this same statement. On August 31, 1923, there was outstanding 11,592 shares and a five per cent dividend which amounted to $57,960. From June 15, 1923, to October 1, 1923, the defendant had been charging off monthly on its books for depreciation, breakage, bad debts, etc., $10,000 per month. By this method of bookkeeping, the business was being operated at a loss, and there were no funds from which a dividend could be paid. Those who had purchased stock were inquiring daily at the stores and of the officers of the company as to when the dividend would be forthcoming and, as Mr. Harter, the vice-president, expressed it, "They were haunting us night and day, morning and noon, to know if we would not declare a dividend." Harter further testified as follows: "Q. How did it happen that Petitfils Confiserie paid a dividend on

October 15, 1923? A. That happened merely to take care of Mr. Beecher Laswell's office to cover up the remarks and statements that his men had been making from time to time. . . . Q. The company knew what those remarks were, didn't it? A. It had been fighting that all the time. Q. They knew what they were, however? A. Well, not all of them. . . . Q. Well, what one? A. Well, in regard to quarterly dividends and guaranteeing twenty per cent the first year, twenty-eight per cent, following on down the line, that is what they were bucking on from the start.''

One of the guarantees of dividends was contained in a pamphlet entitled ''Profits in Sweets,'' reading in part as follows: ''It is the expectation of Petitfils Confiserie to continue the regular five per cent cash dividends quarterly (20% per annum). Based on the estimated earnings of the new corporation, as shown below, the annual profits on the capitalization of $2,000,000 should be at least 28%.''

Therefore, in order to satisfy the present stockholders and to allure new ones into purchasing stock, a scheme was worked out by the secretary of the defendant and its stockholders, by which the books were changed and all amounts that had been set aside for depreciation, breakage, bad debts, etc., were ordered placed back on the books. By so doing, the books showed there were profits enough to pay a dividend and, therefore, out of this the October 15th dividend was declared.

It is clear, therefore, that no July dividend was paid to the stockholders of the defendant corporation, and that the October dividend was not paid out of the *net earnings,* but out of the *gross earnings* of the company. No dividend should have been paid, or could have rightfully been paid, in October, and the defendant changed its books to show a false profit in order to pay this dividend. It is clear from the undisputed evidence that the October dividend was not paid in good faith, and was not paid from the net earnings of defendant, but paid out of its reserve fund. The representations made to appellant that from the earnings of defendant a five per cent dividend had been paid in July and October were false.

The complaint further alleges that defendant, as an additional inducement to plaintiff, stated to plaintiff that

Petitfils was paid nothing for the goodwill of his business, and that this statement was untrue. The findings of the court do not refer to this allegation of the complaint, but find that "nothing was paid W. M. Petitfils by the defendant corporation." The undisputed testimony shows that Petitfils was paid $180,000 for goodwill, and that it was paid in money and stock in the corporation. This was also a misrepresentation of a material fact.

The evidence shows, without conflict, that other misrepresentations of material facts were made to plaintiff, but we deem it unnecessary to go into detail relative to them.

We have reviewed the entire record carefully and we are fully convinced that the findings of the trial court favorable to defendant cannot be sustained by the evidence. In reaching this conclusion, we are not unmindful of the fact that some of the representations made to appellant, especially those relating to the future earnings, of the defendant corporation, are merely to be considered "expressions of opinion," and not fraudulent representations, although positively made and afterward proven to be untrue. However, excluding entirely all statements that could be termed "expressions of opinion," there remains in the record abundant uncontradicted evidence of many false representations made to appellant by defendant concerning past and existing facts, which defendant knew to be false and made for the purpose of inducing appellant to purchase the stock, and said false representations did, in fact, lead him to invest $20,000 in stock of Petitfils Confiserie Corporation, which he would not have done had the *true financial condition of defendant corporation been revealed to him.* Neither are we unmindful of the well-settled rule that this court cannot reverse a judgment for insufficiency of the evidence if there is a conflict in the testimony, or if there is any substantial evidence to support the findings and judgment of the trial court. But in this case, there is absolutely no evidence that we are able to discover, that will support the findings and judgment of the trial court. The only witness produced by defendant was Mr. Long, the former secretary of the defendant corporation, and there were only two points of conflict in his testimony with that of the appellant. Appellant testified that Long told him that the defendant was making a *net profit* of

sixty per cent; Long denied this and stated it was possible that he told plaintiff the *gross profits* would be between fifty and sixty per cent. Again, plaintiff testified that Long stated to him that the lease on the Broadway store No. 1 had been appraised at $1,000,000, but this was also denied by Long, who testified that he told plaintiff that *all of the leases of defendant were valued at $1,000,000.* The court found for defendant on both of these points, and nowhere in appellant's brief is there to be found any suggestion that appellant is seeking to have the findings on these two points set aside or disturbed.

There is no merit in the contention of defendant, or the finding of the trial court, that appellant was guilty of laches in rescinding the purchase. The following facts are uncontradicted: Appellant purchased the stock in November, 1923. In February, 1924, he inquired concerning the dividend. Defendant stated that payment of the dividend had been delayed by order of the corporation commissioner until a reserve had been set aside to cover depreciation in defendant's leases. On May 2, 1924, appellant received a $500 check and at that time was notified that another dividend would be paid in July; that about July 1st appellant was advised by defendant that the additional dividend would be set out within a few days. On July 4th plaintiff left on a trip to Europe and was absent from California until October 15, 1924. During appellant's absence he did not know that the promised dividend had not been paid and did not learn this until he returned to Los Angeles on or about October 15, 1924. While absent from California appellant did not receive any information regarding the defendant or his stock. Appellant testified that between October 15th and October 20th he discovered the fraud and on October 21, 1924, served the notice of rescission. It appears that appellant gave notice of rescission promptly after discovering the fraud.

Defendant contends that appellant cannot maintain this action because he did not offer to return the $500 dividend before suit. There is no merit in this contention. The complaint alleges, ''That at the time plaintiff rescinded the contract, he tendered to the defendant and offered to return . . . said 200 shares of stock so purchased by him and *every other thing of value received by him in connection*

*with said sale.*'' This allegation is admitted by the answer. The question of the actual physical tender of the $500 is not, therefore, an issue by the pleadings. Furthermore, under the circumstances of the instant case, it was not necessary to offer to return the $500 received as a dividend on the stock as a condition precedent to rescission. If appellant fails in the present action, he will be entitled to retain the $500 dividend; if he succeeds in this action, he will be entitled to retain the $500 as a partial restoration of the $20,000 and have judgment against defendant for the balance. In no event, therefore, could the defendant possibly be injured. The law does not require idle acts, and nothing would seem more idle than to require appellant, as a mere formal prerequisite to trial, to offer to return to the defendant the $500 which defendant would in no event be entitled to keep. (See sec. 3532, Civ. Code; *Matteson* v. *Wagoner,* 147 Cal. 739 [82 Pac. 436]; *Haserot* v. *Keller,* 67 Cal. App. 659–673 [228 Pac. 383]; *Richards* v. *Farmers' & Merchants' Bank,* 7 Cal. App. 387–393 [94 Pac. 393]; *Garcia* v. *California Truck Co.,* 183 Cal. 767 [192 Pac. 708].)

Judgment reversed.

Sturtevant, J., and Nourse, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 24, 1928.

All the Justices present concurred.