[Civ. No. 16369. Second Dist., Div. Two. Aug. 6, 1948.]

MYNETTE PODLASKY, Respondent, v. GUY PRICE et al.,
Appellants.

152

Howard F. Shepherd for Appellants.

Mark F. Jones and Irving S. Baltimore for Respondent.

MOORE, P. J.—Having executed a writing which bound her to purchase an eight-unit apartment building in Beverly Hills for the sum of $67,500 from defendants Bearce, plaintiff effected a mutual rescission of the agreement of sale. This action was instituted by her for the purpose of enforcing her rescission of (1) the contract of purchase and (2) the compromise and release from that contract. The resulting decree

having adjudged the rescission, defendants demand a reversal thereof on the grounds (1) that the attempt to rescind the contract of purchase was a nullity, the same having been already mutually rescinded; (2) that the alleged representations made to induce the purchase were not available as grounds for rescinding the compromise settlement; (3) that such settlement was not rescindable; (4) that the conduct of the trial judge deprived appellants of a fair trial.

## THE FACTS

In July, 1945, Mr. and Mrs. Bearce, herein referred to as Bearce, owned the building involved, one apartment of which was designated as the "penthouse." They listed the property for sale with appellant Price who was consulted by respondent on July 31 for investment advice. He recommended the purchase of the Bearce apartments. Thereafter, accompanied by her friend, appellant Birnbaum, also a real estate broker, respondent called upon Price. After Birnbaum approved of the investment, with respondent's express consent he made an agreement with Price that in the event of sale Price would pay him 25 per cent of the commission, which he in turn agreed to divide with respondent. In the course of the negotiations for the sale Price exhibited a printed prospectus or "set up" of the data concerning earnings of the apartments. That document contained a declaration of the O.P.A. ceiling rental values of the eight apartments indicating that the ceiling rental value of the penthouse was $175 monthly.

After respondent and her husband had with Price inspected the building, on the husband's request Birnbaum advised her not to make the purchase. However, after respondent had alone agreed with Price to buy the building Birnbaum read and approved the written offer to purchase on August 24, 1945, and advised her to sign it. She thereupon affixed her signature to the writing and paid Price $5,000. The following morning respondent visited the office of Price and urged him to release her from the contract. He replied that he had worked four hours with the owners and had already induced them to accept her offer for the apartments. After he declined to exhibit the Bearce acceptance of her offer she delivered to him a written notice of her revocation of her offer to purchase. Shortly thereafter Attorney Baltimore appeared at Price's office and demanded the privilege of inspecting the Bearces' acceptance. Having been re-

fused, the attorney departed but soon reappeared with respondent, whereupon Price exhibited the signed acceptance and adhered to his refusal to cancel the purchase. As proof of his contention that the acceptance had not been signed prior to the revocation Baltimore testified that he had seen Mr. Bearce enter Price's office between his first call alone and his second call with respondent, who argues that such circumstance is evidence that the acceptance had not been signed prior to her revocation.

Respondent then commenced negotiations to effect a rescission of the contract. After extended negotiations the parties arrived at a compromise of their controversy. Mutual releases were executed on September 15, 1945, whereby respondent received $1,000, the Bearces retained $625 and Price kept $3,475, out of which sum in accordance with his agreement he paid $847.75 to Birnbaum who paid one-half thereof to respondent.

### She Alleges Discovery of Fraud and Moves to Rescind

In March, 1946, respondent discovered that on August 24, 1945, there was no ceiling price on the penthouse of the building under the orders of the Office of Price Administration. Deeming such discovery to be proof of wilful deceit on the part of appellants, respondent caused a notice of rescission of the agreement to purchase and the agreement of compromise to be served on appellants whereby she demanded the return to her of $4,000 and agreed to return whatsoever she had received from appellants. In her notice she specified the grounds of rescission to be her reliance upon the representation of appellants that the O.P.A. ceiling rental value of the penthouse was $175 per month, whereas no ceiling upon that unit had been fixed prior to the date of her compromise settlement but the rental ceiling of only $100 monthly had been granted after September 15; (2) her continued reliance at the time of the compromise upon the statements of appellants (a) that no misrepresentation had been made in obtaining her offer of purchase and (b) that all statements of fact contained in the prospectus exhibited to respondent were true, whereas such statements were untrue; (3) her reliance upon the representation of appellants that the offer to purchase had been fully accepted by the Bearces prior to service upon Price of her notice of revocation, whereas such representation was false. Her notice was not accompanied by an offer to pay Mr. Birnbaum the sum he had paid her in the compromise settlement. Neither

did respondent at the same time offer to resume her status under the purchase agreement. Her complaint in this action, to enforce the rescission, repeated the contents of her notice of rescission.

The court made findings that appellants had falsely represented to respondent that the penthouse "was rented at a monthly rental of $175" and that appellants Price and Bearce had falsely stated to respondent "that said sum of $175 per month was the OPA ceiling rental for said premises," whereas in fact there was no rental ceiling on the penthouse; that appellants knew such representations to be false; that respondent relied upon them and only by reason thereof signed the purchase contract; that prior to Bearces' acceptance respondent revoked her offer; that while relying upon appellants' representations that no false statement had been made to induce her to sign the agreement she agreed to and did enter the compromise settlement; that respondent's attorney on August 27, 1945, investigated the representations of appellants as to the O.P.A. ceiling prices and was informed by the Office of Price Administration that the apartment building was duly registered. Judgment was upon such findings entered against appellants Price and Bearce for $3,156.25 and against Birnbaum for $421.88.

### The Finding That There Was No Contract of Purchase

The finding is that respondent withdrew her offer before Bearce accepted it. If this had been true there could have been no agreement. A contract cannot be created by the method of offer and acceptance if the offer is withdrawn prior to its acceptance. If there was no contract there was no basis for the compromise; neither was there any basis for the notice of rescission served upon appellants, nor for this action to enforce the so-called rescission. Therefore the finding is at total variance with the conduct of respondent and with the theory of rescission on the ground of fraudulent representation. Furthermore, such finding is without evidential support; there is not a scintilla of substantial evidence of the "acceptance after the revocation." The finding rests solely upon the suspicion of Attorney Baltimore which was born of (1) Price's refusal promptly to exhibit the signed acceptance to respondent and (2) the observed visit of Mr. Bearce to the office of Price. The finding is contrary to the positive and unambiguous testimony of the only signatories to the acceptance. All three testified that they had each signed it on

the evening of August 24, whereas respondent advances no claim other than that she served a notice of withdrawal on the morning of August 25. The implication that Mr. Bearce signed the acceptance on the 25th when Baltimore saw him enter Price's office is refuted by the instrument itself. It bears the signature of Mrs. Bearce who did not accompany her husband into the Price office on the morning of the attempted revocation. Since it bore her signature at the time it was shown to respondent, she could have signed it only at some time prior to respondent's revocation. Suspicion on the part of any witness, however learned or observant, is not a sufficient basis upon which to predicate a finding of a gross fraud.

## THE ALLEGED FRAUD NOT OF SUFFICIENT INFLUENCE TO DEFEAT FREEDOM OF CONSENT

The test which determines whether a fraud is actionable is: would it reasonably defeat or materially impair freedom of consent of the contractee? A contract is a voluntary agreement and the intention to enter into it should be formed freely and voluntarily, unaffected by unconscionable contributions. "A consent which is not free is nevertheless not absolutely void, but may be rescinded by the parties. . . ." (Civ. Code, § 1566.) One of the factors which prevents the exercise of free will in entering into an agreement is fraud in the inducement whereby the consent is procured. For a fraudulent representation to be actionable it must be one of either a past or a present material fact made with *scienter* on which the defrauded party relied to his detriment. (Rest. Contracts, § 470 et seq.; 13 C.J. § 279, p. 382.) Not only is materiality an essential element of the deceitful representation, but the defrauded party must have been induced to act by reason of his reliance upon the verity of the statement. (*Harding* v. *Robinson*, 175 Cal. 534, 539 [166 P. 808]; *De Garmo* v. *Petitfils Confiserie*, 93 Cal.App. 261, 265 [269 P. 692].) Section 1572 of the Civil Code defines actual fraud as "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true."

In the instant case the fraud which is alleged to have vitiated the free consent of respondent is evidenced by the typewritten prospectus delivered by Price to respondent before she signed the purchase agreement. It contains not only a

detailed listing of the rentals of the apartments earned during August and previous months of 1945 but immediately below the income figures appears the following: "The above are O.P.A. ceilings; rentals should be higher and it is reasonable to expect higher income when O.P.A. is lifted." At the bottom of the page appears the following printed note: "The above statements are based upon information from sources deemed reliable and which we believe to be correct, but we cannot assume responsibility for errors or omissions therein." This was nothing less than a warning that Bearce and Price disclaimed responsibility for the statements contained in the set up and that a buyer should beware. At the trial respondent proved that on the date she signed the purchase agreement there were O.P.A. ceiling prices on all the units except the penthouse. She contends that appellants' assertion that the penthouse was subject to O.P.A. limitations was a misrepresentation of a material fact, and that she relied upon it and was induced thereby to execute the agreement. She supports her argument with the recital that at some time after September 15, 1945, the O.P.A. fixed the ceiling on that unit at $100 monthly. The fact that an O.P.A. ceiling of a lesser sum was placed on the penthouse months later is entirely irrelevant since respondent's alleged deception and detriment must be based upon (a) the nonexistence of an O.P.A. ceiling on the penthouse on August 24, 1945, (b) its materiality, and (c) her reliance thereon if it was material. It is clearly evident that her decision to buy the building was not derived from the penthouse rental being represented as the O.P.A. ceiling.

According to her own testimony respondent intended to use the income from the apartments to pay the mortgage about to be assumed. Her reliance, therefore, was not on the assertion that the O.P.A. ceiling on the penthouse existed on August 24, but rather upon her belief that it would continue to exist and thereby produce a high income for her. From this it is evident that she relied upon a mere conclusion, entirely of her own creation, derived from her assumption that because a ceiling did exist it would continue to exist. Such a conclusion would not have been warranted even if there had been an O.P.A. ceiling on the penthouse, for a continuance or change of controls is a matter entirely within the purview of the federal government. Also, her basis for such conclusion involved the assumptions (1) that the extant social and economic conditions would be static, (2) that the same regulations would remain unchanged, and (3) that the same ap-

praisers or others of their school would continue to fix rental ceilings. If she did not assume those possibilities as facts then the statement of the ceiling on the penthouse was meaningless to her and could not have deceived her.

If perchance respondent did in fact apprehend a significance in a ceiling rental on the apartments it is more reasonable than otherwise to believe that she must have concluded that it would profit her as owner of the property not to have the ceiling. Without controls she would be at liberty to exact any rental the traffic would bear. If the O.P.A. had fixed a ceiling on the penthouse prior to August 24, 1945, there is neither presumption nor proof that the rental would have been for a sum less than the monthly rental then being paid, to wit, $175. Inasmuch as the court found that Bearce was then receiving that sum as rental for the penthouse is it reasonable to believe that respondent relied upon the representation of the O.P.A. ceiling and not upon Price's statement of the actual receipts for the rental? If it was earning that sum and there was no ceiling upon its price the new owner was in a far more favorable position. Therefore it could not have been reasonably found that respondent relied upon the alleged misrepresentation as to the penthouse rental ceiling in view of the proof of her complete reliance upon other considerations.

Furthermore, at the very threshold of her conferences with Price respondent was warned not to rely upon the contents of the prospectus. Its statement that ''the above are OPA ceilings'' was qualified by the language of the footnote whereby appellants other than Birnbaum disclaimed responsibility for ''errors or omissions therein.'' The office of such language was to emphasize that appellants did not pledge their faith to the statements concerning the ceilings on the Bearce apartments. Therefore the printed caveat or warning would excuse an innocent misrepresentation or misstatement of fact, even though it would not justify a false representation knowingly made.

Since the court found ''that all the defendants other than defendant I. W. Birnbaum knew that no OPA ceiling price had been placed on said penthouse,'' it becomes necessary to determine the correctness of that finding. Price testified that he did not know that the penthouse was not registered. At the trial appellants' attorney attempted to show that when O.P.A. regulations went into effect the penthouse was occupied by the owner and that its registry was not required; that when Bearce bought the building he occupied the penthouse; con-

sequently, it was unnecessary for it to be registered; that when Bearce bought it he received a "set up" showing a ceiling of $175 on the penthouse. This testimony was improperly excluded. It would have shown that Bearce *innocently* made the representation which the court found to have been made with knowledge of its falsity. Contrary to the pronouncement of the trial judge, there is a vast distinction between an untruthful statement due to negligence and one born of a fraudulent desire to cheat another. The author of the former is liable only for his error to his contractee, while the originator of a fraudulent scheme to swindle becomes indebted to the state also for his unsocial act. Admittedly Bearce should have known of the existence or absence of O.P.A. ceilings on his building, but his neglect to know was not *scienter*. The exculpatory notice on the statement presented to respondent by Price would extend to the innocent though negligent representations of Bearce, his principal.

 From the foregoing considerations the finding that a deliberate, fraudulent representation was made by appellants is unsupported by the evidence. Such a finding is too serious a charge to be left to conjecture or surmise. A finding of wilful fraud must be based upon evidence that is clear and convincing and free from ambiguity. (*Bruce* v. *Bruce*, 71 Cal.App.2d 641, 644 [163 P.2d 95]; *Gorman* v. *Steinke*, 7 Cal.App.2d 507, 510 [46 P.2d 293]; *Shaw* v. *Imperial Mutual Life & Benefit Association*, 4 Cal.App.2d 534, 537 [41 P.2d 574].) The presumption is against fraud and is not overcome by shadowy evidence (*Shapiro* v. *Equitable Life Assurance Society*, 76 Cal.App.2d 75, 91 [172 P.2d 725]), and must be clearly made out (*Wolfe* v. *Severns*, 109 Cal.App. 476, 480 [293 P. 156]). It follows that the court's finding of a wilful misrepresentation was prejudicial error.

### THE COMPROMISE NOT RESCINDABLE

But conceding, arguendo, that a deliberate fraud had been perpetrated on respondent, she faces the insurmountable fact that by her own act she settled all her claims against appellants for damages or rescission. During three weeks of discussion, investigation and consideration she and her counsel had abundant opportunity to appraise and reappraise her bargain and the building and to ascertain the facts as to whether the O.P.A. had fixed a ceiling of $175 monthly on the rental of the penthouse prior to September 15, 1945. Indeed, so sus-

picious was Attorney Baltimore at the time of his entry into the negotiations with Price that he called at the O.P.A. on August 27, 1945, where he was advised that the ceiling rental on the penthouse was the same as set forth in the "set up."

The fraud declared as grounds for the rescission of the compromise agreement is a repetition of the same allegations made as the basis for rescinding the purchase contract. But as to the inducements to compromise respondent's testimony that she relied upon the representations of appellants is weakened if not wholly negated by the facts (1) that during the negotiations for a release of respondent the Office of Price Administration was open and accessible; (2) that Attorney Baltimore made inquiry there when in quest of facts with which to compel acceptance of respondent's revocation, and (3) that he was informed that ceiling prices had been fixed on all the units in the apartment building as set out in the prospectus. Thus respondent did not rely upon the truthfulness of appellants' representations but rather on the independent investigation by her attorney. ▪ When a vendee is suspicious of the representations made by his vendor and proceeds to inquire for himself, is unhampered in his investigation, is aided by his own attorney and acts upon his own judgment, then the purchase may not be canceled by reason of misstatements made by the vendor as an inducement. (*Colton* v. *Stanford*, 82 Cal. 351, 383 [23 P. 16, 16 Am.St.Rep. 137].)

▪ Since respondent employed both a veteran broker and a seasoned lawyer who advised her throughout the negotiations for the compromise, she did not rely on anything told her by appellants and therefore cannot enforce the rescission. (*McCarter* v. *Zeller*, 35 Cal.App. 593, 596 [170 P. 636].) If Baltimore inquired of the O.P.A. and was advised that the penthouse had been registered, he learned exactly what Bearce or Price believed to be the fact. And since respondent knew all that was known to her attorney, she is in no position to demand a judgment of rescission.

It is not denied that respondent entered into the compromise after Baltimore's investigation of the O.P.A. ceilings on the apartments and that he advised respondent. This fact places the responsibility for the compromise solely upon respondent. She had been dissatisfied with her purchase from the 25th day of August. According to her own testimony she made the settlement because she wished to rid herself of the burdens of her investment. Upon that subject she testified as follows: "As I told Mr. Price, I could not go on with the deal, that I

had been in terrible mental trouble, that my husband had disapproved of the deal, that I did not have the money to go on with it; my husband refused to help me; that he was going to divorce me if I would go on with the deal, and for him to have mercy on me and call the owner, and tell him not to go on with the deal." Her attorney testified that he told Mr. Bearce on August 25, 1945: "She feels she has made a mistake, and regardless of the merits of her position if we try to avoid the deal against you, well, it seems to me that she is entitled to some sympathy. . . . She would like to get out of the deal . . . and get me to cancel the deal." ▉ To justify a decree of rescission because of misrepresentations it must be shown not only that they were false and intended to deceive, but also that they actually did deceive the plaintiff and that he relied upon them. (*Maggini* v. *McBain,* 65 Cal.App. 133, 135 [223 P. 428] ; *McCarter* v. *Zeller, supra.*) ▉ Moreover, where a party to a contract of compromise is aware that one of the statements made to induce him to settle is false he is under a legal duty to make a complete investigation and may not rely upon the statements of his contractee. (*Carpenter* v. *Hamilton,* 18 Cal.App.2d 69, 75 [62 P.2d 1397].)

Having on the advice of her lawyer elected to salvage what she could from what she deemed her hasty action, and having had her own attorney investigate her claims (1) that her offer was not accepted prior to her revocation and (2) that she had been defrauded in her purchase, respondent settled once and for all any action for rescission or for damages by her settlement of September 15, 1945. ▉ The doctrine that equity aids the vigilant applies as well to one who while claiming to be the victim of a fraud seeks to be released from a contract with which he is displeased as to one who stands at the threshold of his bargain.

### The Effect of Including Birnbaum in the Judgment

▉ The court specifically found that appellant Birnbaum did not know that there had been no O.P.A. ceiling price placed on the penthouse. It is not even alleged that Birnbaum was an agent of Price or of the Bearces, but it was proved that he was a broker and friend of respondent. She had brought him into the transaction for his advice to her only. He rendered no service to Price, for in fact no sale of the property was ever consummated. All his services were intended for the benefit of respondent. The payment by Price to Birnbaum of a portion of the commission had the

effect of paying for Birnbaum's services to her. Also it effected, an additional saving to respondent of $421.87 in the compromise settlement. In any event, if respondent had been entitled to rescind both the purchase and compromise agreements, Birnbaum was not a party to either; and even if he had been he was allied with respondent and not with any appellant. There was utterly no foundation for a judgment against him.

### CONDUCT OF THE TRIAL JUDGE

If no other grounds for reversal existed, the conduct of the trial judge alone would adequately supply them. Judge Burnell at various stages of the trial made statements calculated to intimidate the litigants and their counsel and to confuse the witnesses. The following are some of his responses to testimony or to argument of counsel.

In interrogating a witness as to prior statements in his deposition the following colloquy took place:

"THE COURT: The only question is whether those questions were asked you and whether you gave those answers, as appear on the typewritten transcript of the testimony taken down by the reporter when your deposition was taken. Were they asked you or were they not? Do you have to think over that? Why don't you answer the question? A. I don't get it.

"THE COURT: I cannot give people brains. Mr. Birnbaum, when your deposition was taken, there was a reporter that took everything down just as this lady is taking it down. This is a transcript of what she took down. The only question—nobody could make it simpler—is whether the question Mr. Jones just showed to you and read to you was asked you at the time your deposition was taken." (Tr. 145.)

In interrogating Mrs. Birnbaum, an elderly woman, the following is reported:

"MR. JONES: I move that the answer be stricken.

"THE COURT: That may be stricken.

"THE WITNESS: That is all I heard.

"THE COURT: Some of these people look like human beings.

"THE WITNESS: You asked what I heard.

"THE COURT: Will you be quiet a moment as if you were endowed with certain intelligence. I tell them, counsel tells them. They proceed and give their opinions and conclusions, which nobody is interested in. The whole answer will be stricken out. Will you please listen. Do you know what the word conversation means? Did you ever see it? A. Yes.

"The Court: You better look it up in the dictionary, and you will find it means what two or more people said. We are not interested in what you think or your conclusions, or opinions. Please listen." (Tr. 169.)

And later:

"The Court: It will be stricken. I give up. You can't beat brains in these people's heads." (Tr. 171.)

And again:

"Q. Did you state that? A. I did say it.

"Q. Did she say—strike that out. She hasn't answered my questions.

"The Court: That is three strikes.

"Mr. Jones: We will start again.

"The Witness: She is the one that said it.

"Mr. Jones: I move that answer be stricken.

"The Court: That will be stricken. I give up. I often wonder why some of these people are put in asylums and others are left out.

"Mr. Jones: Mrs. Birnbaum——

"The Court: Just pretend you have a brain now. Just play you have. Listen to the question and answer what is asked you." (Tr. 172.)

When counsel attempted to show that Mr. Bearce was unaware of the nonexistence of O.P.A. regulations on the penthouse the court said:

"Does that justify making a misstatement of a material fact in order to induce someone into making a contract, if someone made a similar misstatement to him?

"Mr. Shepherd: It shows good faith, your Honor.

"The Court: Wouldn't it be better if he said, 'If I made some misstatements, as an honest man, I will give you back your money'?

"Mr. Shepherd: I do not think so.

"The Court: You and I do not agree on our ethics.

"Mr. Jones: Your Honor has that exactly; if he doesn't know what the facts are.

"The Court: It is the same thing if he makes a false statement, knowing it is false, and makes a statement without taking reasonable precautions to determine whether it is true." (Tr. 175.)

In attempting to ascertain the extent of the preliminary negotiations of the parties to the agreement and while appellant Price was on the stand the following is reported:

"Q. Between the time he made that offer and August 24, was Mrs. Podlasky at your office or in conversation with you? A. I think she may have been in once or twice. She came in quite often. Her purpose——

"The Court: How do you know what her purpose was? A. She tried to get me to accept an offer of $65,000.

"The Court: This man looks almost intelligent at times.

"Mr. Shepherd: He is quite intelligent, your Honor.

"The Court: I doubt it very much. He keeps on interpolating what he thinks people's motives were and how furniture was arranged.

"Mr. Shepherd: If he were a court official he might be a little more capable. I think our witness is under a little strain while on the witness stand.

"The Court: They seem to be unable to be silent. They seem to be utterly incapable of answering a question and then stop talking, and not interpolating extraneous matter. I have told witnesses on both sides that, time and time again. Apparently we are trying a case with a bunch of morons.

"The Witness: Your Honor——

"The Court: No one has asked you a question.

"The Witness: ——I would like to state this.

"The Court: You keep quiet, now. You will wind up in jail if you do not look out." (Tr. 193.)

When Mrs. Podlasky attempted to testify as to her notice of rescission, the following transpired:

"Q. By Mr. Jones: Did you have a copy of that paper you handed to Mr. Price that morning? A. I jotted it down that I hereby cancel——

"The Court: Won't you please use your brains? Listen to the question. You were asked a very simple question. Did you have a copy of the paper you gave Mr. Price? A. To my knowledge I did write it down and hand it to Mr. Baltimore. Did I hand it to you?

"The Court: Please confine yourself to answering questions that are asked you.

"The Witness: Can I say I don't remember?

"Mr. Jones: You can say that, yes.

"Q. Do you know what was on that paper you handed to Mr. Price? A. I do.

"Q. Please state what it was.

"Mr. Shepherd: I object to that on the ground that it is incompetent, not the best evidence.

"THE COURT: You were asked to produce the paper and you refused to produce it. The objection is overruled.

"MR. SHEPHERD: There was no notice to produce.

"MR. BALTIMORE: Yes, there was.

"THE COURT: You produce it then.

"MR. SHEPHERD: The notice is: "that plaintiff demands the production of and requires——"

"THE COURT: Let us forget it. The objection is overruled. I get tired of these asinine objections that prevent the judge from finding what the facts are." (Tr. 60.)

Later, in reference to the same witness the court said: "I do not know what we are going to do with this witness. The Court has admonished her time and time again; she hasn't any brains or she will not use them. I do not know which." (Tr. 64.)

When Attorney Baltimore was testifying as to Price's refusal to show him Bearces' acceptance he testified as follows:

"I said, 'Guy, when you were flat on your fanny I came to your rescue.' I said, 'What a heel you are' and we walked out.

"MR. SHEPHERD: I move to strike that statement, your Honor. I have no objection to any conversation about the refusal of delivery, but these side remarks between counsel and Mr. Price are unnecessary.

"THE COURT: I think we are entitled to all the conversation. I want to know the facts in the case. When counsel starts to make objections I get suspicious." (Tr. 115.)

When Price was testifying as to his knowledge of the existence of O.P.A. regulations:

"Q. Did you honestly believe at the time that setup was given to Mrs. Podlasky, that the penthouse was registered at $175 a month? A. I believed it had been, that it was registered.

"THE COURT: You did not check it up with the Office of Price Administration to find out, did you? A. No, your Honor, I——

"THE COURT: When you have answered, cease firing." (Tr. 188.)

In the course of the summation of the trial the following transpired:

"MR. SHEPHERD: May I say something?

"THE COURT: Yes. Save it for the District Court of Ap-

peal or the Supreme Court. The judgment will go for the plaintiff as prayed. How about interest on this amount?

"MR. JONES: I think we are entitled to it.

"THE COURT: Interest from the time of the deposit. Will you prepare findings?

"MR. JONES: Yes.

"MR. SHEPHERD: If your Honor has not given full judgment, I was going to call your attention to a case.

"THE COURT: I do not want any cases.

"MR. SHEPHERD: On a deposit, your Honor.

"THE COURT: You have already made your argument.

"MR. SHEPHERD: All right.

"THE COURT: I do not permit attorneys after they have made their arguments and the Court has decided the case, to attempt to argue the Court out of its decision. Lawyers have tried many times but it has never worked with me. Will you prepare findings, unless they are waived, Mr. Jones.

"MR. JONES: Thank you.

"MR. SHEPHERD: May I ask a question. Are you going to find Mr. Price guilty of fraud in the findings?

"THE COURT: False representations with utter disregard of the truth." (Tr. 263.)

Such conduct is not that of a legendary tyro but of a living, functioning judge who apparently delights in exhibitions calculated to deprive the court of the complacency, the disinterestedness, the zeal for truth, the judicial calm and mien indispensable to the avoidance of prejudicial error. The pronouncements of his personal opinions upon counsel and witnesses impair their efficacy as well as that of the court. Similar behavior by Judge Burnell has been the subject of many reversals during the past 24 years (see *Etzel* v. *Rosenbloom*, 83 Cal.App.2d 758 [189 P.2d 848]) without effecting a reform in his behavior or causing him to conform with orthodox judicial deportment. However, it is still error thus to conduct a trial.

The judgment is reversed with instructions to enter judgment for defendants.

McCOMB and WILSON, JJ.—We concur in the opinion prepared by Mr. Presiding Justice Moore. In addition it is our view that the nonjudicial conduct of Judge Burnell during the trial of numerous cases, many of which are cited in *Etzel* v. *Rosenbloom*, 83 Cal.App.2d 758 [189 P.2d 848],

is verging on a public scandal and is bringing the courts and the administration of justice into disrepute. (See also *People* v. *Reese* (1934), 136 Cal.App. 657 at 665 et seq. [29 P.2d 450].)\*

No longer should such disgraceful acts be lightly brushed aside. In order that taxpayers, litigants, witnesses and lawyers

---

\*Division One of the Second Appellate District Court of Appeal in discussing the misconduct of Judge Burnell, in *People* v. *Reese, supra,* says:

"Although not embracing a complete list of the separate occasions on each of which it is asserted by appellants that the trial court was guilty of misconduct in the trial of the action, an inspection of the specifications of error in that regard reveals the fact that the attention of this court is directed to not less than sixty-eight separate violations of proper decorum on the part of the trial judge. A few of such specifications will suffice:

"On the first day of the trial of the action, in giving the required statutory admonition to the jury, and in especially cautioning them to have nothing to do with the attorneys on either side of the case, the judge made the following remarks:

" 'So just be a little bit careful, please. I don't want you to think that these gentlemen all have leprosy, or smallpox, that you have to get from them, but just kindly figure that they have all got the measles, or something you don't want to be exposed to. It is just a little tip, ladies and gentlemen, because I don't want anything talked around such as I have indicated. . .'.

"Referring to objections by counsel for defendant to the reading of testimony given by a witness on a former trial of the action, and to the fact that the witness might return to the state before the trial could be completed, the trial judge said:

" 'If he is (has returned to the state), anyone that wishes can put him on the stand, but the idea is to get the facts before this jury, and not to play a game to see how many points either side can win.'

"Without any apparent underlying reason for the statement, at one time the judge said:

" 'We can put on enough side-shows in this court of our own, without going into Judge White's court and copying his part of it.'

"Apparently with the same thought in mind, following a recess of the court and a stipulation that the jury was present, the judge remarked:

" 'All right, proceed. Both sides of the show are here. We might just as well go ahead.'

"It appears that one of the attorneys representing one of the defendants was looking into a 'bag' which was the property of one of the other attorneys in the case, and the judge said:

" 'Judge Perky's bag; we want to make sure which judge you are talking about. I only hope it doesn't leak on you, Mr. Lawson.'

"When a complaining witness had testified that he had paid the sum of $20,000 to one of the defendants in connection with the sale of shares of stock, the attorney for the People asked him:

" 'Q. Did you get anything for that $20,000? A. Not a thing.' The judge then interposed the following question: 'You got experience, didn't you? A. Plenty of that.'

"On another occasion, the court made the following remark to a witness on the stand:

" 'Mr. Robinson, you are just a little too eager to answer questions

may be protected from further insults, harassment and ridicule at his caprice and whim two courses at least are readily available: (1) The judicial commission, acting on recommendation of the governor, can retire him for the "reason of mental . . . disability that is or is likely to be of a permanent character" rendering him unfit to perform the duties of the

---

without giving either side a chance to object. If you see either of these gentlemen going through gesticulations or motions that indicate that they are about to give birth to an objection, just stop a moment.'

"At a time when one of counsel for defendants was examining one of the witnesses on cross-examination, the judge interrupted and began to examine the witness himself. After several questions had been asked by the court, one of the attorneys for one of the defendants interposed the following remark:

" 'If your Honor please, I prefer to examine my own witness.

" 'The COURT: I dare say, but when it appears that the witness is becoming confused in matters, I am going to take a hand in order to get the thing straightened out and the facts before the jury. We are not playing a game to get the witness balled up on the witness stand.'

In criticising one of the attorneys for his manner in asking questions, the judge said:

" 'I think we might make better time if Mr. Blalock would supply Judge Perky with one of these old-fashioned streetcar bells, to let him ring it when he wants to go ahead.'

"During the reading of certain testimony, Mr. Perky and Mr. Kelby took turns in reading from the transcript, and upon one occasion, as Mr. Kelby was about to take up the reading, the judge made the following comment: 'All right; we will listen to the reading of the Word from the Reverend Kelby now.'

"With reference to the proposed reading of each of several checks which had been introduced as exhibits on the trial of the action, the judge made this remark: 'There is no heart or sex appeal in reading checks.'

"On another occasion the judge addressed the following remark to one of the attorneys for one of the defendants: 'I am not particular for too much decorum in the court room, but I have never yet allowed any attorney to stand on his head; he will have to stand on his feet.'

"Following the cross-examination of one of the witnesses introduced by the defendants, the judge had this to say: 'Are you gentlemen all through with Mr. Mort, with what is left of him? . . . All right, Mr. Mort, I guess if they are all through with you, you have been here a couple of days, and what is left of you can be excused.'

"One of the attorneys for one of the defendants having stated to the court that he would prepare proposed instructions for one of the defendants as soon as he could obtain a copy of the instructions offered by the People, the judge made the following remark:

" 'Yes, do so, as soon as you can. The idea of most instructions seems to be to confuse the jury, or to try to confuse them as far as possible.'

"It appears that counsel for the People had a book which belonged to Judge Perky, who was one of the attorneys for one of the defendants, and that Judge Perky had made an inquiry for it; whereupon the judge remarked:

" 'Well, I don't think anyone would want to take a date book away from you, Judge Perky, particularly if it contained any live telephone numbers.'

"At a time when the court had commented upon the testimony given by one of the witnesses for the prosecution to the effect that he did

office which he occupies. (The Judges' Retirement Act [Stats. 1937, p. 2204; 2 Deering's Gen. Laws, 1944, Act 5849a, §§ 2, 3, p. 2252 et. seq.].) (2) The Legislature may remove him by a "concurrent resolution of both Houses of the Legislature adopted by a two-thirds vote of each House." (Const., State of California, art. VI, § 10.)

A petition for a rehearing was denied August 23, 1948, and respondent's petition for a hearing by the Supreme Court was denied September 30, 1948. Edmonds, J., and Carter, J., voted for a hearing.

---

not think that the attorneys for the defendant 'should put a sort of shotgun statement to her answer', without any objection thereto having been interposed by either of the attorneys for either of the defendants, the judge said:

" 'If you want an exception, however, I will give you an exception. In fact, I will give you another exception for good measure on account of the depression.' To which remark one of the attorneys said: 'Well, I wish to take an exception to the statement of the court.' THE COURT: 'Well, I will give you another one on that; only one on that, however. I cannot give you too many bargains.'

"In cross-examination of a witness on attempted impeachment by one of the attorneys for defendant, he asked a question which had a tendency to distinguish between two persons who bore the same name. In connection therewith, the judge made the following remark: 'Well, it is assuming facts not in evidence. In the first place, it is assuming that she is particular. We don't know whether she is or not. . . .'

"During the examination of a witness, reference was made to the kind of work which he was doing, and the court said: 'What was he doing, flagpole sitting?'

Referring to another witness, the court said: 'Well, he has made his explanation of why he made a certain remark, indicating a tendency, perhaps, to commit the crime of mayhem.'

"Referring to the fact that one judge may not agree with another with reference to some question of law, the judge of the trial court made the following disparaging remark: 'He (Judge White) might have made a different ruling on some question than I might have made. We do not always agree, and that is why we have Supreme Courts, and rubber mats on the cuspidors. . . .'

"As indicating what the judge of the trial court thought of the mine in question, the following remark of the trial judge may be cited: 'In other words, you don't contend that that *hole in the ground* had ore in it, or didn't have ore in it.'

"Commenting upon certain proposed exhibits in the case, the judge remarked: 'Are you about to introduce the three wise monkeys as an exhibit here?' Whereupon counsel for the prosecution said: 'There is only one prosecution counsel.' THE COURT: 'Gentlemen, it is practically twelve o'clock, and I think that is a happy thought to adjourn with.'

"Extended comment would seem to be unnecessary. In cases too numerous to properly admit of citation thereof, because of judicial misconduct that was insignificant compared to that which so unmistakably appears in the instant case, the respective judgments therein were reversed."